UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-20978-CIV-DAMIAN/D'ANGELO

DELTEC BANK & TRUST LIMITED,

     **Plaintiff,**

vs.

MICHAEL CARBONARA, et al.,

     **Defendants.**

_____/

### REPORT AND RECOMMENDATION DENYING PLAINTIFF'S EXPEDITED MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**THIS CAUSE** is before the Court on Plaintiff Deltec Bank & Trust Limited's Expedited Motion for a Temporary Restraining Order and Preliminary Injunction Freezing Specific Assets and for an Immediate Accounting and Limited Expedited Discovery filed on May 6, 2025 ("Motion for a Temporary Restraining Order") (DE 39).[1]  Defendants Michael Carbonara, Ibanera LLC, and Ibanera Private Limited filed their response in opposition on May 13, 2025 (DE 47).  On May 15, 2025 and May 16, 2025, the Court held an evidentiary hearing on the Motion (DE 62, 63).  On May 20, 2025, Plaintiff filed its reply (DE 66), and Defendants filed their sur-reply on May 28, 2025 (DE 80).  Having considered the Parties' arguments, the relevant legal authorities, and the pertinent portions of the record, and being otherwise fully advised in the premises, for the reasons stated below, it is respectfully recommended that Plaintiff's Motion for a Temporary Restraining Order (DE 39) be **DENIED**.

---

[1] This case was referred to the undersigned Magistrate Judge for all pre-trial, non-dispositive matters and for a Report and Recommendation on any dispositive matters (DE 50).

I. **FACTUAL BACKGROUND AND PROCEDURAL POSTURE**

Plaintiff is a Bahamian bank, and Defendant Ibanera LLC is a money service business "that provides businesses and institutions with global connectivity for banking and payments" (DE 22 ¶¶ 20-21 (citation omitted)).  Defendant Carbonara is the Chief Executive Officer of Ibanera LLC (*id.* ¶ 12).  Defendant Ibanera Private Limited is a major payments institution licensed by the Monetary Authority of Singapore ("MAS") (*id.* ¶ 14).  On July 18, 2024, Plaintiff entered into the Processing Services Agreement ("PSA") with Ibanera LLC and Ibanera Private Limited (collectively, "Ibanera"), in which Ibanera agreed to "perform cross-border transfers and provide multicurrency payments accounts for [Plaintiff] and its clients" (*id.* ¶ 24).

Under the PSA, Ibanera agreed to maintain "Segregated Client Accounts" in financial institutions of its choosing (*id.* ¶ 26).  Ibanera promised to hold funds received from Plaintiff and its clients in trust "at all times by Ibanera for and on behalf of [Plaintiff], for the sole benefit of [Plainitff]" in the Segregated Client Accounts (*id.* ¶ 26).  Accordingly, Ibanera Private Limited established one or more accounts with the Development Bank of Singapore ("DBS") (*id.* ¶ 31).  The PSA also provided that Plaintiff must maintain an "Operating Account" with Ibanera with a minimum balance of $100,000 USD (*id.* ¶ 29).  Ibanera could deduct its fees from the Operating Account and also use the funds in the account to set-off any part of Plaintiff's liabilities or other amounts payable without prior notice (*id.*).  Pursuant to its obligations under the PSA, Ibanera "executed cross-border money transfers via the SWIFT network using Ibanera [Private Limited]'s DBS account and license from the [MAS]" (*id.* ¶ 35).  The PSA provided that upon receiving a payment instruction from Plaintiff, Ibanera "shall be responsible to execute the respective Payment as soon as possible and in any event by no later than three (3) [b]usiness [d]ays" (*id.* ¶ 28).

In October 2024, Ibanera began having issues with the ability to execute payments on behalf of Plaintiff (*id.* ¶ 37).  On October 22, 2024, Plaintiff learned that Ibanera's SWIFT payments via DBS were currently on hold (*id.*).  Two days later, Plaintiff stated that it would move cash to other accounts to avoid any liquidity issues if Ibanera was unable to execute client wires for an extended period (*id.* ¶ 38).  On November 7, 2024, Plaintiff requested an update regarding Ibanera's ability to perform cross-border transmittals (*id.* ¶ 41).  Four days later, Plaintiff followed up again and noted that it had the equivalent of $31.7 million USD in Ibanera's accounts (*id.*).  Plaintiff confirmed that Ibanera still did not have SWIFT access (*id.* ¶ 42).  Around this time, Plaintiff learned that DBS had closed Ibanera Private Limited's account due to alleged improper use (*id.* ¶ 40).  After DBS closed Ibanera's account, Ibanera opened an account for Plaintiff with Green Link Digital Bank in Singapore and used a company called NIUM to effectuate cross-border transfers (*id.* ¶ 44).  On November 19, 2024, Plaintiff requested that Ibanera transfer $15 million USD to another one of its accounts (*id.* ¶ 46).  A month later, Ibanera transferred $12 million USD to Plaintiff (*id.*).  Notwithstanding its transfer of the partial amount, Ibanera's issues with money transfers continued in December 2024 (*id.* ¶ 47).

Beginning in January 2025, Plaintiff made repeated requests to Ibanera to transfer the remaining funds—the equivalent of approximately $20 million USD—to Plaintiff's account in another financial institution (*id.* ¶ 49).  Although Ibanera acknowledged the receipt of Plaintiff's transfer request, it did not transfer the funds to Plaintiff (*id.* ¶¶ 49-60).  On February 3, 2025, after not receiving a response from Ibanera, Plaintiff's in-house legal counsel sent a demand letter to Carbonara regarding the failure to receive the payment transfer (*id.* ¶ 61).  On February 11, 2025, Ibanera's counsel responded to Plaintiff's demand letter and stated that Plaintiff had failed to comply with its obligations under the PSA, which caused Ibanera to suffer significant losses (*id.*

¶ 64).  According to Plaintiff, this was the first time Ibanera complained about Plaintiff's alleged breaches that resulted in purported losses (*id.*).  On February 21, 2025, Plaintiff's outside counsel responded to Ibanera and stated that the baseless claims were a pretext to hold Plaintiff's funds (*id.* ¶ 69).  In response, on February 26, 2025, Ibanera's counsel promised that Plaintiff's funds were in "safeguarded accounts and no one [was] misusing or misapplying such funds" (*id.* ¶ 70). Ibanera added that it was currently the subject of an audit by DBS and the MAS and also undertaking an internal audit and investigation (*id.* ¶ 71).  From February to April 2025, Plaintiff and Ibanera, through their respective counsel, continued to communicate regarding the return of Plaintiff's funds (*id.* ¶¶ 64-93).

Plaintiff alleges that Ibanera's counsel represented that Ibanera was entitled to keep the funds at issue to offset its losses caused by Plaintiff's supposed unauthorized activities (*id.* ¶¶ 88-89).  However, Plaintiff claims that no unauthorized activities were ever identified, and Plaintiff never received notice that it had violated its obligations under the PSA (*id.* ¶ 90).  Plaintiff further alleges that Ibanera LLC is improperly holding the equivalent of $20,674,066 USD (*id.* ¶ 82). Plaintiff alleges that despite its repeated requests, Defendants have provided unsupported excuses for their refusal to return Plaintiff's funds and have not made additional transfers (*id.* ¶¶ 92-100).

On March 3, 2025, Plaintiff filed the instant case against Defendants Carbonara and Ibanera (DE 1).  Plaintiff filed a Verified Amended Complaint on May 1, 2025 (DE 22).  The Verified Amended Complaint asserts nine claims against the three Defendants: (1) breach of contract against Ibanera; (2) breach of fiduciary duties against Ibanera; (3) aiding and abetting breach of fiduciary duty against Carbonara; (4) conversion against Ibanera; (5) aiding and abetting conversion against Carbonara; (6) civil theft against all Defendants; (7) unjust enrichment against all Defendants; (8) wrongful set-off against Ibanera; and (9) defamation against Ibanera (*id.*

¶¶ 103-66).  That same day, Plaintiff filed its first Expedited Motion for a Temporary Restraining Order and Preliminary Injunction, requesting a temporary restraining order to prohibit the dissipation of Plaintiff's funds, freeze Plaintiff's assets held by Ibanera, conduct an expedited accounting, repatriate Plaintiff's funds, and propound expedited discovery (DE 24).  On May 5, 2025, the Court denied the first Expedited Motion for a Temporary Restraining Order without prejudice for failure to comply with the Local Rules for the Southern District of Florida (DE 34). The next day, on May 6, 2025, Plaintiff filed its renewed Expedited Motion for a Temporary Restraining Order and Preliminary Injunction, requesting the same equitable relief (DE 39).  On May 13, 2025, Defendants filed their opposition to Plaintiff's Motion (DE 47).  On May 20, 2025, Plaintiff filed a reply (DE 66), and on May 28, 2025, Defendants filed a sur-reply (DE 80).

## II.    THE EVIDENTIARY HEARING

The undersigned held an evidentiary hearing on the Motion for Temporary Restraining Order on May 15 and May 16, 2025 (DE 62, 63).  At the evidentiary hearing, Plaintiff argued that it was entitled to injunctive relief due to Defendants' breach of the PSA or, alternatively, unjust enrichment, breach of fiduciary duty, conversion, and wrongful set-off claims (DE 84).  Plaintiff argued that despite the existence of the PSA, Ibanera owed and breached fiduciary duties arising from its role as a trustee of special funds held for Plaintiff (*id.* at 16:20-18:10).  Specifically, Plaintiff contended that Ibanera's failure to provide an accounting, to return funds upon demand, or to communicate the status of those funds supported its request for equitable relief (*id.* at 16:20-18:10, 21:2-8).  In contrast, Defendants argued that Plaintiff's claims are contractual in nature and did not warrant equitable relief, as monetary damages are available.  Defendants claim that they acted within their rights under the PSA by holding Plaintiff's funds while the internal and external investigations into the transactions utilizing the DBS account are completed (*id.* at 22:19-24:8).

Plaintiff called its corporate representative, Shonel Clarke, to testify (DE 84, 86). Ms. Clarke testified that she is a Senior Manager in the Operations Department and has been employed at Deltec Bank & Trust Limited for ten years (DE 84 at 69:12-21). As a Senior Manager, Ms. Clarke manages a team that handles cash transfers—that is, "the inflow and outflow of cash from Deltec Bank" (*id.* at 69:25-70:1). Ms. Clarke also oversees activity regarding "settlement, investigations, [and] traces" (*id.* at 70:1-3). During her direct examination, Ms. Clarke testified that the Parties' business relationship started in July 2024 (*id.* at 70:21-25). Ibanera acted as a "payment provider for payment services for [Plaintiff's] clients and the bank" and held client funds for Plaintiff in Segregated Client Accounts (*id.* at 70:19-20, 122:9-25). Ms. Clarke stated that she personally worked with Ibanera by providing instructions, overseeing the inflow of funds, and managing the requests for information (*id.* at 71:1-11). Additionally, Ms. Clarke explained that DBS acted as "the banking partner of Ibanera" in Singapore (*id.* at 71:12-20). Ms. Clarke stated that Plaintiff and Ibanera used a platform called "io.finnet" as an intermediary to communicate regarding wire transfer requests (*id.* at 71:21-7:11).

Ms. Clarke testified that in late 2024, Plaintiff began experiencing difficulties with the wire transfer requests it sent to Ibanera (*id.* at 75:3-10). According to Ms. Clarke, Ibanera refused to execute client-directed transfers and provided no adequate explanation or justification despite Plaintiff's repeated inquiries (*id.* at 75-100). She further testified that Plaintiff was unable to obtain information regarding the status of approximately $20 million in various currencies (*id.* at 91-103). During Ms. Clarke's cross-examination, Defendants questioned Plaintiff's compliance with certain anti-money laundering requirements under the PSA (*id.* at 126:10-16). Ms. Clarke responded that Plaintiff satisfied its anti-money laundering obligations "at the onset of the relationship" with Ibanera (*id.* at 126:17-22). Defendants also questioned Ms. Clarke regarding

the number of requests for information Plaintiff received from Ibanera, and she testified that forty to forty-five requests, in comparison to approximately 1,500 transactions, was common and minimal (*id.* at 127:15-24).  On re-direct, Ms. Clarke explained that following the sale to Britannia Bank & Trust Ltd. ("Britannia"), some of Plaintiff's clients agreed to transfer their accounts to Britannia, and those clients were fully funded with cash holdings (*id.* at 163:16-23).

During the evidentiary hearing, Plaintiff introduced thirty-six (36) exhibits (DE 71). Plaintiff's Exhibits 2, 3, and 7 through 10 consisted of email correspondence, demonstrating the operation of client accounts and the banking relationship between Plaintiff and Ibanera (DE 71-1, 71-2, 71-3, 71-4, 71-5, 71-6).  These exhibits also reflected that Plaintiff generally responded to Ibanera's requests for information within a few days, contrary to Defendants' purported concerns about the timeliness of Plaintiff's responses (*id.*).  Plaintiff's Exhibits 14 through 25 comprised additional email correspondence related to the funds at issue, including communications from Plaintiff's counsel requesting information, an accounting, and the freezing of the relevant funds (DE 71-7, 71-8, 71-9, 71-10, 71-11, 71-12, 71-13, 71-14, 71-15, 71-16, 71-17, 71-18).  Exhibit 26 contained a request for information issued through io.finnet concerning two transfers from Plaintiff to Ibanera (DE 71-19, DE 84 at 111:2-5), and Exhibit 29 was the response to that request (DE 71-20, DE 84 at 112:8-113:1).  Exhibit 33 included Plaintiff's confirmation of a transfer to Ibanera and stated the purpose of the transfer (DE 71-21, DE 84 at 115:2-8).  Plaintiff's Exhibit 34 demonstrated the typical process by which a request for information was relayed—from Ibanera to io.finnet and then to Plaintiff (DE 71-22, DE 84 at 145:22-146:9).  Plaintiff's Exhibits 44 and 45 included additional requests for information sent to Plaintiff (DE 71-23, 71-24), and Exhibit 51 confirmed that Plaintiff was the ultimate beneficiary of funds transferred to Ibanera (DE 71-25, DE 86 at 72:14-23).  Exhibit 95 was a screenshot displaying Plaintiff's internal system used to

send wire transfers and monitor "incoming credits and outgoing debits" (DE 71-26, DE 84 at 79:18-21). Lastly, Exhibit 96 was also screenshot from Plaintiff's internal system, showing outgoing wire transfers of client funds and both incoming and outgoing wire transfers involving Plaintiff's own funds (DE 71-27, DE 84 at 84:4-14).

Further, Plaintiff introduced Exhibits 105 and 113, illustrating Plaintiff's prompt responses to Ibanera's information requests (DE 71-28, DE 71-29, DE 84 at 117:12-15, 149:25-150:4). Plaintiff introduced Exhibit 115 to demonstrate that, in certain instances, Plaintiff was given a few weeks to respond to requests for information (DE 71-30, DE 84 at 151:4-9). Additionally, Plaintiff introduced Exhibits 117 and 121, which consisted of emails regarding transfers to Ibanera, and Exhibit 118, which explained the relationship between io.finnet and Ibanera (DE 71-31, 71-32, 71-33, DE 86 at 25:23-26:17, 34:18-35:13, 52:13-53:22). Lastly, Exhibits 124 and 126 included a request for information and the corresponding response, while Exhibit 125 summarized the requests for information Plaintiff received, including the dates on which requests were received and the responses were provided (DE 71-34, 71-35, 71-36, DE 86 at 39:12-16, 67:14-22, 68:2-3).

Defendants called Michael Carbonara as a witness (DE 84 at 168:6-11). Mr. Carbonara testified that he has served as Ibanera LLC's CEO since its founding in 2020 (*id.* at 168:9-13). He explained that Ibanera LLC "[p]rovides payments[,] remittance services[,] currency exchange[,] and financial services" (*id.* at 168:14-17). Mr. Carbonara testified that in October 2024, the MAS revoked Ibanera Private Limited's license without prior notice (*id.* at 172:10-15). Immediately thereafter, DBS closed Ibanera Private Limited's multicurrency account due to regulatory non-compliance (*id.* at 172:16-25). In November 2024, DBS mailed physical checks, in various currencies, to Ibanera Private Limited's office in Singapore (*id.* at 173:17-25). Mr. Carbonara stated that, despite the closure, because Ibanera retained SWIFT capabilities through other

financial institutions, it attempted to transmit funds to its customers' alternate accounts (*id.* at 177:17-24).  For instance, Ibanera sent approximately $12 million to Plaintiff, consisting primarily of cryptocurrency and the remainder in U.S. dollars (*id.* at 177:25-178:13).  He also testified that, by early January 2025, Ibanera Private Limited was able to receive funds into its account at NIUM (*id.* at 176:9-21).

Following the closure of Ibanera Private Limited's DBS account and revocation of its Singapore license, Defendants underwent a series of internal and external audits (*id.* at 176-179).  In December 2024, Defendants engaged an auditor to assist with the investigation and wind-down process related to the MAS license revocation (*id.* at 176:24-177:13).  In January 2025, Defendants began their independent anti-money laundering audit (*id.* at 178:18-20).  Mr. Carbonara testified that during the course of these audits, Defendants identified irregularities involving Plaintiff's transactions (*id.* at 178:21-25).  In addition to the two on-going audits, in March 2025, Defendants retained Ethikom Consultancy Private Limited ("Ethikom") to conduct a specialized audit of Plaintiff's transactions (*id.* at 179:3-9, 181:20-21).  Mr. Carbonara confirmed that Ethikom issued an interim report, which was admitted as Defendants' Exhibit 1, because the investigation was still ongoing (*id.* at 180:22-25).  As part of its review, Ethikom submitted several requests for information concerning a significant volume of Plaintiff's transactions (*id.* at 181:22-182:14).  According to Mr. Carbonara, these requests were intentionally broad in scope, consistent with the nature of the underlying regulatory inquiries (*id.*).  Ethikom also issued requests for information to Britannia (*id.* at 182:15-22).  Mr. Carbonara testified that, as of the date of the evidentiary hearing, Ibanera continued to respond to requests from both DBS and the MAS (*id.* at 183:8-15).

On May 2, 2025, Ibanera issued a notice of termination of the PSA to Plaintiff (*id.* at 188:25-189:1).  Mr. Carbonara testified that Ibanera retained all the funds associated with Plaintiff

(*id.* at 191:4-15).  He clarified that Ibanera has not used any of Plaintiff's funds to offset any potential liability Plaintiff may owe (*id.* at 191:16-19).  Regarding the impact of the instant litigation, Mr. Carbonara testified that Ibanera has lost clients, banking relationships, and other business opportunities (*id.* at 191:20-25).  Mr. Carbonara further explained that Ibanera has suffered significant reputational and financial harm (*id.* at 192:1-13).

During his cross-examination, Mr. Carbonara testified that after Ibanera terminated the PSA, it transferred Plaintiff's funds into a USDC stablecoin (DE 86 at 5:8-23).  He stated that the coins are held in a wallet owned by Ibanera LLC (*id.* at 5:17-20).  Mr. Carbonara explained that Ibanera LLC transferred the funds into stablecoin to "safely safeguard the funds" while Ibanera LLC investigated Plaintiff's alleged breach of the PSA (*id.* at 9:11-12, 16:7-11).  He further testified that the funds are stored on the Ledger platform, and Ibanera LLC maintains documentation identifying the location of the funds (*id.* at 15:18-23, 71:25-72:4).  Mr. Carbonara also clarified that although Ibanera had previously withdrawn at least $25,000 per month in fees, it was not currently deducting any fees from the cryptocurrency (*id.* at 14:18-24, 15:5-10).

Defendants introduced six (6) exhibits during the evidentiary hearing (DE 73). Defendants' Exhibit 1 consisted of Ethikom's interim report regarding Ibanera's internal audit of Plaintiff's transactions (DE 73-1).  The report included preliminary findings identifying discrepancies in those transactions (*id.*).  Defendants introduced Mr. Carbonara's declaration as Exhibit 2, which explained Plaintiff's alleged violations of the PSA and the revocation of Ibanera Private Limited's account with DBS (DE 73-2).  Defendants introduced the PSA as Exhibit 3 (DE 73-3).  In addition, Defendants introduced Exhibits 4 through 6, which contained Plaintiff's responses to some of Ibanera's prior requests for information (DE 73-4, 73-5, 73-6).

III.     **LEGAL STANDARD**

Federal Rule of Civil Procedure 65 governs the issuance of a temporary restraining order and preliminary injunction.  Fed. R. Civ. P. 65(a), (b).  "The purpose of a temporary restraining order, like a preliminary injunction, is to protect against irreparable injury and preserve the status quo until the district court renders a meaningful decision on the merits." *Schiavo ex. rel Schindler v. Schiavo*, 403 F.3d 1223, 1231 (11th Cir. 2005).  The standard for issuing a temporary restraining order is the same as required for a preliminary injunction.  *Enrique v. Dep't of Child. & Fam. Servs.*, No. 08-CIV-21441, 2008 WL 4809234, at *2 (S.D. Fla. Nov. 4, 2008).  To obtain a temporary restraining order, a party must demonstrate: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *8th Sense, Inc. v. Humes McCoy Aviation, Inc.*, No. 21-CIV-22792, 2021 WL 8202671, at *3 (S.D. Fla. Aug. 3, 2021) (citation omitted).  "The burden of persuasion in all of the four requirements is at all times upon the plaintiff." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (citation omitted).

"If the movant is unable to establish a likelihood of success on the merits, a court need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002) (citing *Pittman v. Cole*, 267 F.3d 1269, 1292 (11th Cir. 2001)).  "The requesting party's failure to demonstrate a 'substantial likelihood of success on the merits' may defeat the party's claim, regardless of its ability to establish any of the other elements." *Haitian Refugee Ctr., Inc. v. Christopher*, 43 F.3d 1431, 1432 (11th Cir. 1995) (citing *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994)).  "Failure to show any of the four factors is fatal, and the most common failure is not

showing a substantial likelihood of success on the merits." *Am. C.L. Union of Fla., Inc. v. Mia.-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) (citation omitted). Further, "irreparable injury 'must be neither remote nor speculative, but actual and imminent.'" *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citation omitted). "An injury is 'irreparable' only if it cannot be undone through monetary remedies. The key word in this consideration is *irreparable.*" *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) (emphasis in original) (citation omitted).

## IV.    DISCUSSION

Plaintiff requests a temporary restraining order and preliminary injunction to prevent Defendants from dissipating its funds (DE 39). Plaintiff argues that it has repeatedly instructed Ibanera to transmit the funds at issue to Plaintiff's account in another bank, but Ibanera has expressly refused to do so (*id.* at 1). According to Plaintiff, Ibanera held the disputed funds solely in trust for Plaintiff, but now Ibanera intends to keep the money in violation of the PSA (*id.* at 1-2). Plaintiff contends that it has a substantial likelihood of success on the merits as to the claims for breach of contract, breach of fiduciary duty, conversion, unjust enrichment, and wrongful set-off (*id.*at 5). Plaintiff argues that it will suffer immediate and irreparable injury if a temporary restraining order is not issued, because Ibanera may dissipate the specific funds it is holding (*id.* at 16-17). Plaintiff further argues that a monetary remedy would be insufficient, because Ibanera refused to disclose the location of the funds and to release the funds despite Plaintiff's urgent demands (*id.* at 17). Plaintiff also claims that the threatened injury—namely, "the total or partial dissipation of [Plaintiff's funds]"—will outweigh any harm to Defendants (*id.* at 18). Likewise, Plaintiff argues that an injunction will serve the public interest, because it will "ensure that Plaintiff may eventually be made whole" (*id.*). As a result, Plaintiff seeks a temporary restraining order "to

freeze those specifically-identifiable funds, . . . provide an immediate accounting of what Ibanera has done with the funds, repatriate the funds to a United States bank account[,] . . . and order limited expedited discovery into the disposition of the funds" (*id.* at 2).

At the outset, Defendants argue that Plaintiff is not entitled to injunctive relief, because Plaintiff sold its banking interest to Britannia, such that it is presently unclear how Plaintiff claims an interest in either "client funds or . . . its own banking-related funds that are at issue in this litigation" (DE 47 at 10).[2]  Separately, Defendants argue that Plaintiff does not satisfy any of the requirements for a temporary restraining order or a preliminary injunction (*id.* at 2).  Plaintiff cannot establish a substantial likelihood of success on the merits, because "Ibanera is entitled under the PSA to hold the funds at issue while it completes its investigation" (*id.*).  Indeed, Ibanera "has not impermissibly converted any funds, and it has not wrongfully set-off those funds against amounts" Plaintiff may owe (*id.*).  As to irreparable injury, Defendants argue that "Ibanera is securely holding the funds at issue while it completes its investigation," as permitted under the PSA (*id.*).  Defendants argue that the potential injury to Ibanera outweighs any purported harm to Plaintiff, because it would cause Ibanera to lose funds that it could retain to offset Plaintiff's liability (*id.*).  Lastly, Defendants claim that it is in the public interest "to allow Ibanera to exercise its contractual rights and to complete its ongoing investigation before [the] funds are released so that they are not released to the wrong party or contrary to the PSA or applicable law" (*id.*).

### A.    Substantial Likelihood of Success on the Merits

Turning to the first element, Plaintiff claims that it has demonstrated a substantial likelihood of success on the merits of its claims, because it has established each element required

---

[2] Testimony at the evidentiary hearing established that Plaintiff sold some of its assets to Britannia, not that Plaintiff has sold its entire "bank interest" (DE 84 at 154:4-17).  This argument is, therefore, unsupported by the facts in the record.

to support its causes of action (DE 39 at 11). "[P]roof of a substantial likelihood of success on the merits is an indispensable prerequisite to a preliminary injunction." *Mod. Pharmacy, LLC v. McKesson Corp.*, No. 18-CIV-22242, 2018 WL 3413037, at *6 (S.D. Fla. June 12, 2018). "Likelihood of success on the merits requires an analysis of the plaintiff's ability to make a showing of each of the required elements of an asserted claim." *Charles Schwab & Co. v. Aviles*, No. 07-CIV-21745, 2007 WL 9702744, at *6 (S.D. Fla. Aug. 23, 2007) (citation omitted). Accordingly, the Court addresses the likelihood of success with respect to each claim asserted by Plaintiff as the basis for injunctive relief.

### 1.    Plaintiff Fails to Demonstrate a Substantial Likelihood of Success on Its Breach of Contract and Unjust Enrichment Claims

#### a.    Breach of Contract

As an initial matter, Defendants argue that Plaintiff cannot seek equitable relief in the form of an injunction based on a breach of contract claim (DE 47 at 13). Defendants further contend that, despite case law holding that injunctive relief is generally unavailable for breach of contract claims seeking money damages, Plaintiff now seeks a constructive trust in connection with its contract claim, even though such relief was neither requested in the Amended Complaint nor in the Motion for a Temporary Restraining Order (DE 80 at 7-8). In response, Plaintiff argues that notwithstanding its breach of contract claim, it may seek injunctive relief, because Defendants "refuse[] to turn over funds held in trust" (DE 66 at 2). Plaintiff claims that since Ibanera "agreed to hold separate identifiable funds in trust" and has refused to return those funds as instructed and converted them to cryptocurrency, a constructive trust is warranted to prevent Defendants from disbursing the funds (*id.* at 3).

"It is axiomatic that equitable relief is only available where there is no adequate remedy at law; cases in which the remedy sought is the recovery of money damages do not fall within the

jurisdiction of equity." *Noble Prestige Ltd. v. Galle*, 83 F.4th 1366, 1382 (11th Cir. 2023) (citation omitted).   Therefore, in "'[c]ases which the remedy sought is the recovery of money,' a district court is powerless to grant preliminary injunctive relief under Rule 65 because the plaintiff's claims 'do not fall within the jurisdiction of equity . . . .'" *Id.* (quoting *Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1518 (11th Cir. 1994)); *see also Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 333 (1999) (holding that the district court "had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages").

Here, the Amended Complaint makes clear that Plaintiff's breach of contract claim can be remedied through monetary damages.   To the extent that Plaintiff now argues that it is entitled to a constructive trust as to its breach of contract claim because Ibanera agreed to hold separate identifiable funds in trust, that argument is unavailing.   *See Mitsubishi Int'l Corp.*, 14 F.3d at 1518-19 (finding that the imposition of a constructive trust is generally not an appropriate remedy in cases where the party seeks to recover money damages).   Plaintiff does not dispute that the relief sought for the breach of contract claim in the Amended Complaint is monetary—that is, damages in the amount of the funds that it transferred to Ibanera plus other sums owed.   Plaintiff has offered no cases or legal authority to show that its contractual claim can support the issuance of injunctive relief under Rule 65.

Even if Plaintiff could obtain an injunction based on its breach of contract claim, Plaintiff still has not made the requisite showing.   Plaintiff relies upon Sections 2.6 and 2.8 of the PSA to establish its substantial likelihood of success on its breach of contract claim.   Section 2.6 states that "[u]pon receipt of a Payment Instruction, Ibanera shall be responsible to execute the respective Payment as soon as possible and in any event by no later than three (3) Business Days in strict

accordance and compliance with the Payment Instructions provided by the Company" (DE 67 § 2.6). Additionally, Section 2.8 states:

> It is understood that all Funds sent by Company to the Segregated Client Account(s) shall be held in trust at all times by Ibanera for and on behalf of the Company, for the sole benefit of the Company, and may be used exclusively and specifically for and on behalf of the Company in accordance with this Agreement. Accordingly, Ibanera may not make any use, encumbrance, lien, promise and/or any other disposition with respect to the Funds, other than in strict accordance with the Company's Payment Instructions.

(*id.* § 2.8). Plaintiff argues that Ibanera breached its obligations to keep the funds in trust and do nothing with them except "transmit them strictly according to [Plaintiff's] payment instructions" (DE 39 at 5). Plaintiff further contends that it has instructed Ibanera to transmit the funds to another account, but Ibanera refused to transmit the funds and therefore, breached the PSA (*id.*).

In response, Defendants point to certain provisions of the PSA that allow Ibanera "to withhold, suspend, defer[,] or delay services or payments of funds for various reasons" (DE 47 at 4). For instance, under Section 9.1.3, Ibanera may hold client money "in suspension until [Plaintiff's] [c]lient account is verified" (DE 67 § 9.1.3). Moreover, under Section 17.4, "in the event of any suggestion/evidence of fraud or illegal activity, Ibanera may refuse transactions and/or suspend the provision of Services . . . without notice pending enquiries" (*id.* § 17.4). Defendants argue that the PSA does not impose an unconditional mandate for Ibanera to return Plaintiff's funds (DE 47 at 5). Rather, the PSA allows Defendants to suspend its services and withhold funds if Plaintiff violates certain provisions of the PSA or engages in purported fraudulent or illegal activity (*id.* at 5-6).

A plaintiff asserting a breach of contract claim must allege: "(1) the existence of a valid contract; (2) a material breach; and (3) damages." *GBB Drink Lab, Inc. v. FSD Biosciences, Inc.*, No. 23-CIV-60800, 2024 WL 454588, at *3 (S.D. Fla. Jan. 8, 2024) (citing *Havens v. Coast Fla.,*

*P.A.*, 117 So. 3d 1179, 1181 (Fla. Dist. Ct. App. 2013)).  In this case, neither party disputes the existence of a valid contract that governs their business relationship (DE 39 at 5, 47 at 10). The Parties seemingly disagree as to whether there was a material breach of the PSA and by whom. Plaintiff alleges that Ibanera breached the PSA, because it refuses to return Plaintiff's funds, even after being repeatedly instructed to do so (DE 39 at 5).  On the other hand, Defendants argue that they have not breached the contract, because the "PSA clearly allows Ibanera to suspend, delay[,] or withhold services while it investigates [Plaintiff's] PSA violations and determines the appropriate allocation of funds pursuant to the PSA" (DE 47 at 10-11).  Moreover, Defendants claim that Plaintiff breached the PSA by refusing to respond to requests for information timely and by engaging in unlawful or impermissible transactions (*id.* at 7).

At the evidentiary hearing, Plaintiff presented correspondence demonstrating that it promptly responded to Ibanera's requests for information (DE 71, 84).  Plaintiff's evidence specifically refuted Defendants' assertions that Plaintiff failed to promptly respond to Defendants' requests for information (DE 84).  Plaintiff's evidence showed that it transferred funds to Ibanera pursuant to the PSA, and Ibanera failed to distribute those funds in accordance with Plaintiff's instructions (*id.*).  Plaintiff's evidence also reflected that its counsel made repeated demands for return of the disputed funds, and Defendants did not comply with the requests (*id.*).  Conversely, Defendants presented evidence that Ibanera Private Limited's DBS account was closed due to noncompliance with applicable regulatory requirements (*id.*).  Following the account closure, Ibanera was subjected to an external regulatory audit by the MAS and initiated its own internal investigation into the purportedly irregular activity associated with Plaintiff's transactions (*id.*). Defendants highlighted that the PSA allows Ibanera to retain funds and suspend account activity if there is suspicion of fraud or illegal activity (DE 47 at 10-11).

Plaintiff has not provided sufficient evidence on the instant record to demonstrate conclusively that Defendants' withholding of funds was not authorized by the PSA.  The evidence presented at the evidentiary hearing does not allow the Court to determine at this stage whether there was a clear breach of the PSA, whether there were multiple breaches of the PSA, and at what point either party breached the PSA.  Therefore, the Court cannot determine at this juncture whether Defendants are currently withholding Plaintiff's funds in violation of the PSA, thus, Plaintiff cannot establish a substantial likelihood of success on the merits.  *See Mod. Pharmacy, LLC*, 2018 WL 3413037, at *6-7 (finding that the plaintiff did not demonstrate a substantial likelihood of success on breach of contract claim due to its failure to identify a specific clause in the contract that was breached).

### b.      Unjust Enrichment

In the alternative, Plaintiff argues that it conferred a benefit upon Defendants by entrusting Ibanera with its funds, and Defendants knowingly accepted and wrongfully retained the funds for their own benefit (DE 39 at 8-9).  Plaintiff claims that Defendants never had a legal right to retain the funds, and it would be inequitable to allow Defendants to keep the benefit of those funds (*id.*).  Defendants argue that the unjust enrichment claim fails, because there is a valid and binding contract that governs the relationship between the parties (DE 47 at 12).

"Florida courts have long recognized a cause of action for unjust enrichment to prevent the wrongful retention of a benefit, or the retention of money or property of another, in violation of good conscience and fundamental principles of justice or equity."  *State Farm Fire & Cas. Co. v. Silver Star Health & Rehab*, 739 F.3d 579, 584 (11th Cir. 2013).  An unjust enrichment claim requires a showing that: "(1) plaintiff conferred a benefit upon the defendant, who has knowledge of that benefit; (2) defendant accepts and retains the conferred benefit; and (3) under the

circumstances, it would be inequitable for the defendant to retain the benefit without paying for it." *Vibo Corp. v. US Flue-Cured Tobacco Growers, Inc.*, 762 F. App'x 703, 705 (11th Cir. 2019).

In the Verified Complaint, Plaintiff pleads a cause of action for unjust enrichment in the alternative (DE 22 ¶¶ 145-150). Neither party disputes that their business relationship is governed by an express contract, the PSA. Moreover, for the same reasons previously discussed, Plaintiff cannot demonstrate a substantial likelihood of success on the unjust enrichment claim. *See Webster v. Royal Caribbean Cruises, Ltd.*, 124 F. Supp. 2d 1317, 1326 (S.D. Fla. 2000) ("[T]he theory of unjust enrichment is equitable in nature and is, therefore, not available where there is an adequate legal remedy."); *Sunrise of Coral Gables Propco, LLC v. Current Builders, Inc.*, No. 22-CIV-21456, 2023 WL 7498136, at *20-21 (S.D. Fla. Oct. 17, 2023) (finding that the plaintiff's unjust enrichment claim failed because neither party denied the existence of an express contract). Indeed, at the evidentiary hearing, Plaintiff conceded that if the PSA governed the Parties' relationship, the unjust enrichment claim "may be more difficult to pursue" (DE 84 at 21:2-8).

### 2. Plaintiff Fails to Demonstrate a Substantial Likelihood of Success on Its Tort Claims

#### a. Independent Tort Doctrine

Florida's independent tort doctrine provides that "a plaintiff may not recast causes of action that are otherwise breach-of-contract claims as tort claims." *BluestarExpo, Inc. v. Enis*, 568 F. Supp. 3d 1332, 1353 (S.D. Fla. 2021) (citation omitted); *see also Pastor v. Bank of Am., N.A.*, 664 F. Supp. 3d 1365, 1367 (S.D. Fla. 2023) ("[T]he doctrine prohibits a claimant from repackag[ing] [ ] breach of contract claims as independent actions in tort." (alteration in original) (citation omitted)). "Therefore, to set forth a claim in tort between parties in contractual privity, a party must allege action beyond and independent of breach of contract that amounts to an independent tort." *Kaye v. Ingenio, Filiale De Loto-Quebec, Inc.*, No. 13-CIV-61687, 2014 WL 2215770, at *4

(S.D. Fla. May 29, 2014) (citation omitted); *see also Med-Stop, Inc. v. Vandutch, Inc.*, No. 23-CIV-21875, 2025 WL 26731, at *5 (S.D. Fla. Jan. 3, 2025) ("[T]he independent tort doctrine requires a plaintiff to plead a tortious action committed separate and apart from the breach of contract." (citation omitted)).

According to Defendants, Plaintiff's tort claims are barred by the independent tort doctrine (DE 47 at 11-12, 80 at 3-7).[3] Turning to the first tort claim, Plaintiff argues that Ibanera's breach of fiduciary duty constitutes an independent tort supporting equitable relief (DE 66 at 7-9). Plaintiff claims that a fiduciary duty between the Parties arose by operation of law as a result of the special deposits Plaintiff made to Ibanera (*id.* at 9).  Plaintiff contends that the nature of deposits it made converted the Parties' relationship from a generic creditor-debtor relationship to a principal-agent relationship (*id.*).  Moreover, Plaintiff argues that by placing the funds into cryptocurrency, Ibanera committed an independent wrongful act that transcends the obligations in the PSA (*id.*).   In contrast, Defendants contend that Plaintiff's breach of fiduciary duty claim is within the scope of the independent tort doctrine, because the tort claim is predicated on conduct that allegedly constitutes a breach of the PSA (DE 80 at 4-5).  Defendants also argue that the breach of fiduciary duty and breach of contract claim seek the same relief, further demonstrating there is no independent tort (*id.* at 3-4).

As to the conversion claim, Plaintiff maintains that Ibanera has converted the funds, because it "expressly agreed that the [funds] would be used only in strict accordance with

---

[3] Although Defendant Michael Carbonara is not a signatory to the PSA, for purposes of the independent tort doctrine, he is in contractual privity with the other parties under his role as CEO of Ibanera LLC.  *See Med-Stop, Inc.*, 2025 WL 26731, at *5 ("[C]ourts also recognize that where a tort claim against a company would be barred by the [independent tort doctrine] because it is based on the same conduct giving rise to the claim for breach, claims against the company's officers or employees based on the same conduct are likewise barred." (citation omitted)).

[Plaintiff]'s payment instructions," and then "wrongfully asserted dominion over the [funds] by refusing to transmit them as instructed and expressing in writing its intent to 'keep' the funds" (DE 39 at 15). However, Defendants argue that, like the other tort claims, the conversion claim fails, because it is "premised on Ibanera's alleged failure to comply with the terms of the PSA" (DE 47 at 12). Defendants maintain that since the conversion claim arises from Ibanera's failure to comply with the terms of the contract, it is merely a restatement and is not independent from Plaintiff's breach of contract claim (*id.*, DE 80 at 6-7). According to Defendants, the conversion claim further fails, because the PSA authorizes Ibanera to retain the funds in its possession while it investigates Plaintiff's allegedly improper conduct (DE 80 at 7).

In the instant case, the independent tort doctrine applies to Plaintiff's claims, because the breach of fiduciary duty and conversion causes of action are reinventions of its breach of contract claim. For example, as to the breach of fiduciary claim, Plaintiff alleges that "[u]nder the PSA, Ibanera promised to hold [Plaintiff]'s funds in trust for [Plaintiff], separate and apart from other accounts" (DE 22 ¶ 110). Plaintiff further alleges that it "transferred the [funds] to Ibanera in reliance upon Ibanera's promise to hold the funds in trust and strictly follow [Plaintiff]'s payment instructions" (*id.* at ¶ 111). It is evident that the breach of fiduciary claim rests on the Parties' obligations arising from their contractual relationship. *See Griffin v. Motorsport Games Inc.*, No. 24-CIV-21929, 2024 WL 4564330, at *9 (S.D. Fla. Oct. 24, 2024) ("The case law does not support a finding of a breach of fiduciary duty when the breach of fiduciary duty rests on the contractual relationship itself." (citation omitted)). Similarly, Plaintiff's conversion claim relies on conduct that is the basis of the breach of contract claim. Particularly, Plaintiff argues that "Ibanera expressly agreed that the [money] would be used only in strict accordance with [Plaintiff's] payment instructions and that the funds belong to [Plaintiff]" (DE 39 at 15). During the hearing,

Plaintiff acknowledged that its conversion claim fails if the Parties' relationship is governed by the PSA (DE 84 at 21:2-9). As such, Plaintiff does not demonstrate that the conversion claim is independent from the purported breach of contract. *See Med-Stop, Inc.*, 2025 WL 26731, at *6 (finding that the conversion claim was not independent from the breach of contract, because the "only reason [the defendants] received [the plaintiff's] deposit in the first place was because the contract demanded it").

Moreover, Plaintiff seeks the same compensatory relief on its breach of contract and tort claims (DE 80 at 3-4). Plaintiff requests "damages of at least $20,674,066 worth of fiat in various currencies, interest on the unlawfully withheld funds, and the additional damages that [Plaintiff] has suffered and will continue to suffer as a result of Ibanera's breach, in an amount of no less than an additional $15,000,000.00 USD . . . and other damages suffered as a result of Ibanera's actions, including attorney's fees and costs . . . ." (DE 22 ¶¶ 108, 117, 131). As such, the independent tort doctrine bars Plaintiff's breach of fiduciary duty, conversion, and wrongful set-off claims. *See Directional Advert. Sols., Inc. v. Jal Equity Corp.*, No. 24-CIV-60450, 2025 WL 857627, at *6 (S.D. Fla. Feb. 11, 2025) (finding that the independent tort doctrine bars tort claims where the damage allegations revealed that the tort damages were not "separate from those in connection with the breach of contract claim"); *see also Steel Media Grp., LLC v. Lewis*, No. 22-CIV-21780, 2023 WL 1413043, at *7 (S.D. Fla. Jan. 6, 2023) ("In the absence of alleged damages stemming from the misrepresentations that are distinct from damages available for the breach of the parties' agreement, the [tort] claim cannot be characterized as independent and is, therefore, barred by the independent tort doctrine."). Because Plaintiff does not show that the tort claims are distinct from its breach of contract claim, Plaintiff cannot show a substantial likelihood of success on the merits.

b.      **Breach of Fiduciary Duty**

Even if the independent tort doctrine did not bar the tort claims, Plaintiff has not demonstrated a substantial likelihood of success on the merits.  Plaintiff contends that Ibanera owed an independent duty to Plaintiff, because Ibanera became a trustee or agent when it agreed to handle Plaintiff's funds "for the purpose of cross-border transfers" (DE 39 at 6).  Plaintiff further asserts that, by accepting special deposits into Segregated Client Accounts titled in Plaintiff's name, Ibanera undertook the responsibility to hold "specific and identifiably property" (DE 66 at 9).  According to Plaintiff, this promise created a principal-agent relationship under the common law (*id.*, DE 84 at 15:5-10).  In response, Defendants argue that any obligations between the Parties flow from the PSA, and there are no independent fiduciary duties that arose, imposing additional obligations on Defendants (DE 47 at 11-12, DE 80 at 4-5).  Furthermore, even if the PSA created a fiduciary duty, they could not have violated any alleged duty, because they have acted in accordance with the terms of the PSA (*id.*).

A claim for breach of fiduciary duty requires: "(1) the existence of a fiduciary duty; (2) the breach of that duty; and (3) damage proximately caused by that breach." *Treco Int'l S.A. v. Kromka*, 706 F. Supp. 2d 1283, 1288 (S.D. Fla. 2010).  "The relationship between a bank and the holder of a deposit account is contractual."  *Carl v. Republic Sec. Bank*, 282 F. Supp. 2d 1358, 1365 (S.D. Fla. 2003) (citation omitted).  Under certain circumstances, a bank may become a trustee when it receives special deposits from a customer "to be applied to a particular purpose and . . . fails to properly apply it . . . ."  *O'Halloran v. First Union Nat'l Bank*, No. 01-CIV-1779, 2006 WL 8439872, at *6 (M.D. Fla. June 26, 2006).  "Deposits are presumed to be 'general' unless they are proven to be 'special.' . . . A special deposit may be created by a contractual agreement between a bank and its depositor, based on the mutual intention and understanding of the parties."  *Carl*, 282

F. Supp. 2d at 1366 (citation omitted).  "A special deposit . . . is a deposit for safekeeping to be returned intact upon demand, or for some specific purpose not contemplating a credit on general account."  *Id.* (citation omitted).

Here, Plaintiff attempts to establish the existence of a separate fiduciary relationship between the Parties under the common law based on alleged special deposits it made to Ibanera for placement in the Segregated Client Accounts, instead of an Operating Account (DE 66 at 7-9). Plaintiff argues that it provided Ibanera with specific instructions on how to dispense with the money (*id.*).  However, nowhere in the Verified Complaint does Plaintiff mention "special deposits."  Indeed, at the evidentiary hearing, Plaintiff did not present any evidence regarding the understanding of the Parties or the course of conduct that demonstrates the funds deposited with Ibanera constituted special deposits.  Plaintiff solely relies on the aforementioned provisions of the PSA regarding the disposition of the money in the Segregated Client Accounts and the disbursement of funds in accordance with the payment instructions.

By contrast, the testimony at the evidentiary hearing established that Ibanera received co-mingled funds from Plaintiff, consisting of a mix of Plaintiff's and its clients' money (DE 84 at 41:8-14, 45:1-3, 72:16-74:7).  Additionally, Defendants presented evidence that Segregated Client Accounts are commonly used in Ibanera's agreements (DE 84 at 184:2-5), and Plaintiff accepted a substantial portion of its funds in cryptocurrency instead of in the original fiat when it requested a return of the $12 million it had transferred to Ibanera (DE 84 at 177:25-178:13).  Notably, the PSA expressly provides that "[e]ach of the Parties shall at all times during the term of [the PSA] be considered, act as, and shall represent itself to be, an independent contractor, and not an agent or employee of the other" (DE 67 § 28.13).  This provision explicitly refutes the notion that the Parties agreed to enter into a principal-agent relationship by virtue of handling special deposits.

Thus, on the instant record, Plaintiff has not demonstrated a substantial likelihood on success of the merits of its breach of fiduciary duty claim.

### 3.      Conversion

Following the evidentiary hearing, Plaintiff argues that Ibanera converted Plaintiff's funds when it withdrew the funds from the Segregated Client Accounts in Plaintiff's name, "converted the various fiat currencies into cryptocurrency, and placed the new tokens into a cryptocurrency account in Ibanera's name while continuing to publish fraudulent online account statements to [Plaintiff] showing that [the funds at issue] were still held safely in particular currencies in particular amounts" (DE 66 at 6).  As to Plaintiff's new theory of conversion, Defendants claim that it is undisputed that Ibanera "still holds the funds at issue in this case and has neither misappropriated nor stolen them" (DE 80 at 6).  Defendants explain that contrary to Plaintiff's arguments, when the funds were held at DBS, the bank account was in Ibanera's name but separated into internal accounts for Plaintiff's and its clients' funds (*id.*).  Now, Ibanera merely moved the money from a bank account to cryptocurrency held in a digital wallet (*id.*).  Moreover, Plaintiff's concern regarding the funds being held in cryptocurrency is purportedly unwarranted, because when Ibanera previously distributed the $12 million to Plaintiff, it distributed $10 million of that amount in stablecoin, which is the same form of cryptocurrency in which Ibanera currently holds the funds (*id.*, DE 84 at 177:25-178:11).

"Under Florida law, conversion is an unauthorized act which deprives another of his property permanently or for an indefinite period of time." *Fogade v. ENB Revocable Tr.*, 263 F.3d 1274, 1291 (11th Cir. 2001) (citation omitted).  A plaintiff stating a claim for conversion "must allege facts sufficient to show ownership of the subject property and facts that the other party wrongfully asserted dominion over that property." *Indus. Park Dev. Corp. v. Am. Exp. Bank, FSB*,

960 F. Supp. 2d 1363, 1366 (M.D. Fla. 2013) (citation omitted).  Plaintiff now attempts to distinguish its conversion claim by arguing that Defendants converted Plaintiff's funds by exchanging them for cryptocurrency tokens, which demonstrates that Defendants took money that it was obligated to hold in trust for Plaintiff in Plaintiff's account and moved the money into cryptocurrency wallets in Defendants' names (DE 66 at 9).

Plaintiff analogizes this case to *Pharma Funding, LLC v. FLTX Holdings, LLC*, No. 20-CIV-21103, 2021 WL 1166051, at *7 (S.D. Fla. Mar. 8, 2021).  In *Pharma Funding*, the plaintiff entrusted certain defendants with a "specific set of funds for safekeeping purposes," and these defendants "failed to segregate the money" as instructed.  *Id.* at *7.  The plaintiff also alleged that the defendants diverted the funds "for their own benefit and use" and "failed to return the stolen money."  *Id.*  The Court noted that the defendants "removed, concealed, or disposed of the payments with the intent to injure or defraud when they redirected the funds to unauthorized accounts for their own use."  *Id.*  The Court reasoned that at the time the parties entered into the contracts, the defendants did not intend to redirect these payments to their correct accounts or reinstate Plaintiff's access to view how the funds were spent.  *Id.*  Based on these allegations, the Court found the plaintiff had sufficiently stated a claim for conversion under Florida law.  *Id.*

However, here, the evidence showed that Defendants have neither stolen nor used the funds for their own purposes.  In fact, at the evidentiary hearing, Defendant Carbonara testified that Ibanera is holding the funds at issue and has not misappropriated them (DE 84 at 191:11-19, DE 86 at 71:22-72:4).  No evidence has been presented that Defendants have dissipated Plaintiff's funds.  In fact, Plaintiff has not conclusively established that the funds were improperly moved. Once Ibanera's account with DBS was closed, the funds had to go somewhere, and Ibanera was obligated to do something.  As Defendant Carbonara explained at the hearing, the money was

placed in cryptocurrency for safekeeping (DE 86 at 9:11-12, 16:7-11).  Furthermore, he stated that

Defendants are not currently withdrawing monthly fees from the funds stored in the cryptocurrency

tokens or off setting their alleged damages (DE 84 at 191:16-19).  Thus, Plaintiff is unable to

demonstrate a likelihood of success on the merits of its conversion claim.

### 4.    Wrongful Set-Off

Plaintiff argues that Ibanera has refused to disclose any grounds for which it could use the

funds at issue as a set-off (DE 39 at 9).  Plaintiff maintains that Ibanera failed to disclose what its

alleged losses are or that the funds are the proper set-off for its losses (*id.*).  Defendants, however,

highlight that the evidence demonstrated that "Ibanera has not used the funds at issue to offset a

debt owed to it by [Plaintiff]" (DE 47 at 13).  Defendants further argue that Ibanera's position has

not changed—Ibanera has merely stated that in the future, it may use "some portion of the funds

to offset amounts" owed by Plaintiff (*id.*).  Even if they were to use funds in the Segregated Client

Accounts, Defendants claim they would be justified to do so, because Plaintiff should have

deposited those funds in the Operating Account instead (*id.*).

"[A] claim of wrongful set-off is simply a subspecies of a conversion claim. . . . As long as

the plaintiff adequately states a claim for wrongful set-off, it is unimportant whether the plaintiff

uses the phrase 'wrongful set-off' or labels his claim as a conversion claim."  *Carl*, 282 F. Supp.

2d 1358, 1371 (citation omitted).  Plaintiff's claim fails, because Plaintiff has not provided

evidence demonstrating that Defendants used the funds to wrongfully set-off any purported loss.

Plaintiff argues that it has a substantial likelihood of succeeding on its claim for wrongful set-off,

"because the [amounts at issue] are special deposits that Ibanera cannot take to satisfy other alleged

obligations" (DE 39 at 16).  But, as Defendants point out, "Ibanera has not used the funds at issue

to offset a debt" (DE 47 at 13).  During the hearing, Defendant Carbonara testified that Ibanera

LLC had not used the money in its possession to collect fees or amounts it believes it is owed, and Plaintiff failed to present evidence that the funds at issue had been misappropriated, stolen, or even used (DE 84 at 191:11-16, DE 86 at 71:22-72:4).   Simply arguing that Ibanera stated it may exercise rights it believes it has to off-set costs incurred from Plaintiff's purported breach of contract at some indeterminate point in the future is not sufficient.

Having failed to establish a likelihood of success on the merits, it is unnecessary for the Court to discuss the remaining considerations.  *See Johnson & Johnson Vision Care, Inc.*, 299 F.3d at 1247 ("If the movant is unable to establish a likelihood of success on the merits, a court need not consider the remaining conditions prerequisite to injunctive relief.").   Nevertheless, even if Plaintiff could show a likelihood of success on the merits for any of its claims, Plaintiff fails to establish the remaining elements for injunctive relief as discussed below.

### B.      Substantial Threat of Irreparable Injury

Plaintiff has failed to demonstrate irreparable harm in this case.  "A showing of irreparable injury is the sine qua non of injunctive relief."  *Siegel*, 234 F.3d at 1176 (citation omitted).  "[T]he asserted irreparable injury must be neither remote nor speculative, but actual and imminent." *Tradewind Invest, LLC v. Elite Catch Seafood, LLC*, No. 20-CIV-22091, 2020 WL 13413837, at *2 (S.D. Fla. May 22, 2020).  "An injury is 'irreparable' only if it cannot be undone through monetary remedies. . . . The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."  *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1285 (citation omitted).  "[T]he absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper."  *Siegel*, 234 F.3d at 1176.

In the Verified Complaint, Plaintiff alleges that the claims for breach of contract, breach of fiduciary duty, and conversion against Ibanera resulted in over $20 million in damages in various currencies, interest on withheld funds, additional consequential damages of at least $15 million, and attorney's fees and costs (DE 22 at ¶¶ 108, 117, 131).  It is evident from the face of the Verified Complaint that Plaintiff's alleged injuries can be satisfied by a money judgment and appear to be strictly monetary in nature; injunctive relief is thus unavailable to redress Plaintiff's claims.  *See SME Racks, Inc. v. Sistemas Mecanicos Para, Electronica, S.A.*, 243 F. App'x 502, 504 (11th Cir. 2007) (affirming district court's denial of an asset-freezing preliminary injunction, because the plaintiffs could be remedied by monetary damages and therefore, could not establish irreparable injury); *Avitis SAS v. Serden Technologies, Inc.*, No. 12-CIV-61296, 2012 WL 12861029, at *4 (S.D. Fla. July 3, 2012) (denying the plaintiff's motion for temporary restraining order for failure to carry its burden with respect to irreparable injury where an adequate remedy at law was available).

Plaintiff also argues that it will suffer irreparable injury, because Defendants *may* dissipate its funds (DE 39 at 13-16).  At the evidentiary hearing, Plaintiff failed to provide any evidence demonstrating that Defendants have dissipated its funds (DE 84, 86).  In fact, Defendant Carbonara expressly testified that Ibanera has retained the funds and has not used any of the funds to offset damages (DE 84 at 191:11-19, DE 86 at 71:22-72:4).  At most, future dissipation of funds is speculative.  Prospective harm, on its own, does not meet the test of imminence.  *See Indep. Cmty. Bank v. Wortley*, No. 05-CIV-80681, 2006 WL 8435505, at *2 (S.D. Fla. Feb. 6, 2006) ("[I]t is not sufficient for Plaintiff to merely suggest the possible dissipation of assets; rather, irreparable harm requires a showing that the loss cannot be compensated for by money damages." (citation omitted)); *see also Watson v. Warden, State of Ala.*, 504 F. App'x 830, 831 (11th Cir. 2013)

(affirming the denial of the plaintiff's motion for a preliminary injunction, as he was unable to establish irreparable injury, which is one not compensable through monetary damages).

Lastly, Plaintiff argues that Ibanera's possession of the funds in cryptocurrency demonstrates irreparable harm (DE 66 at 10). Specifically, Plaintiff argues that Ibanera "moved the tokens into an account in Ibanera LLC's name and controlled by Carbonara," which is sufficient to satisfy the irreparable harm prong (*id.*). Plaintiff points the Court to *Hikmatullaev v. Villa*, No. 23-CIV-22338, 2023 WL 4373225, at *3 (S.D. Fla. June 28, 2023) for support. However, in *Hikmatullaev*, the defendants fraudulently obtained and retained cryptocurrency assets from the plaintiffs, and the Court found that the plaintiffs sufficiently established that there was a "likely danger that if [the defendants'] asserts [were] not frozen, the cryptocurrency assets . . . may be absconded with or otherwise dissipated . . . ." *Id.* That is not the case here. Plaintiff has not provided evidence that Ibanera obtained the money in a fraudulent manner. Rather, Plaintiff repeatedly recognized that it transferred funds to Defendants pursuant to the PSA and even acknowledged that if the money in dispute was held in stablecoin, a repatriation order is unnecessary (DE 84 at 104:11-22). Therefore, Plaintiff has not established a substantial threat of irreparable injury.

### C.    Harm to Defendants and the Public Interest

The third requirement for a temporary restraining order directs the Court to "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief." *Skyket, Inc. v. CSDS Asset Mgmt., LLC*, No. 22-CIV-21651, 2022 WL 4769113, at *10 (S.D. Fla. Aug. 22, 2022). Plaintiff argues that the threatened injury it may face— that is, "the total or partial dissipation" of the funds—outweighs any potential harm to Defendants (DE 39 at 22). In contrast, Defendants argue that Plaintiff does not face a threat of irreparable

30

injury (DE 47 at 16).  Rather, Defendants contend that the entry of an injunction would deprive Ibanera of its contractual rights under the PSA and would further harm Ibanera's client relationships (*id.*).  At the evidentiary hearing, Carbonara testified that the instant action has caused Ibanera to lose clients, banking relationships, and other business opportunities (DE 84 at 191:20-25).

Here, Plaintiff has neither established a substantial likelihood of success on the merits for its breach of contract, breach of fiduciary duty, conversion, and wrongful set-off claims nor that it faces a substantial threat of irreparable injury.  Moreover, as set forth above, at the evidentiary hearing, Defendant Carbonara testified that the funds are located in stablecoin, a cryptocurrency token, and have not been used (DE 86 at 14:18-24, 15:5-10, 18-23).  Nevertheless, where Plaintiff has an adequate remedy at law, Defendants have an interest in enforcing their alleged contractual rights.  The potential harm that a temporary restraining order would cause Defendants outweighs any potential harm to Plaintiff in a situation such as this, where Plaintiff can be compensated through monetary damages for any violations of the PSA.

The fourth and final factor, the public interest, in this matter is limited, because the dispute centers around a private commercial contract.  To the extent that the public interest element is considered, it weighs in Defendants' favor, "because the public is well served when courts enforce the terms of individuals' binding agreements." *Textron Fin. Corp. v. Unique Marine, Inc.*, No. 08-CIV-10082, 2008 WL 4716965, at *9 (S.D. Fla. Oct. 22, 2018).  The third and fourth requirements thus weigh against issuing a temporary restraining order or a preliminary injunction in this case.  Because Plaintiff has not demonstrated all of the requirements for injunctive relief, the Court has no authority to order an asset freeze, accounting, repatriation of the assets, and expedited discovery as Plaintiff requests.

## V.    CONCLUSION

Based on the foregoing, Plaintiff has not satisfied its burden of persuasion as to all prerequisites for injunctive relief.  Therefore, it is respectfully recommended that Plaintiff's Expedited Motion for a Temporary Restraining Order and Preliminary Injunction Freezing Specific Assets and for an Immediate Accounting and Limited Expedited Discovery (DE 39) be **DENIED**.

## VI.    OBJECTIONS

As agreed to by the Parties at the evidentiary hearing, the Parties will have five (5) business days from this Report and Recommendations to file written objections, if any, with the Honorable Melissa Damian, United States District Judge.  Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in this Report and shall bar the Parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report, except upon grounds of plain error, if necessary, in the interest of justice.  *See* 28 U.S.C. § 636(b)(1) (2009); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY SUBMITTED** in Chambers in Miami, Florida on this 9th day of July, 2025.

_____
ELLEN F. D'ANGELO
UNITED STATES MAGISTRATE JUDGE

cc:    All Counsel of Record