**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 1:25-CV-20978-DAMIAN-D'ANGELO**

DELTEC BANK & TRUST LIMITED,

Plaintiff,

v.

MICHAEL CARBONARA and IBANERA LLC,

Defendants.

# THIRD AMENDED COMPLAINT

Plaintiff Deltec Bank & Trust Limited ("Plaintiff" or "Deltec"), by and through its undersigned counsel, files this Third Amended Complaint against Defendant MICHAEL CARBONARA ("Carbonara"), an individual, and Defendant IBANERA LLC ("Ibanera"), and hereby alleges as follows:

## NATURE OF THE ACTION

1. This case is about Defendants' theft of over $20,000,000 belonging to Plaintiff Deltec, a Bahamian bank. When Deltec deposited the funds with Ibanera, they remained Deltec's property and Ibanera promised to hold those funds in trust for and on behalf of Deltec, for the sole benefit of Deltec. Instead, Ibanera—a payment service provider charged with faithfully and promptly transmitting its clients' funds—took Deltec's trust funds, used them to purchase digital tokens, then transferred the tokens to the custody of a crypto exchange in order to reap benefits for itself. Ibanera's CEO, Miami resident Michael Carbonara, provided various pretextual reasons for the theft, including in demonstrably false testimony before this Court.

2. Starting in July 2024, Deltec deposited its funds with both Ibanera and Ibanera's partner in Singapore, Ibanera Private Limited ("Ibanera Singapore"), for the specific purpose of transferring Deltec's funds at Deltec's direction. In November 2024, Ibanera Singapore collapsed after it lost its money transmission license for failure to follow Singapore law. At that time, Ibanera obtained exclusive control of Deltec's funds and assumed all liabilities associated with those funds. Ibanera Singapore is now defunct.

3. In January 2025, Deltec instructed Ibanera to return its funds. For over a month, Ibanera indicated that it was working on the transfer. After Deltec's counsel sent a demand, Ibanera claimed for the first time that Deltec had breached the parties' contract. But Ibanera refused to explain what Deltec had supposedly done—or even where Deltec's funds were being held after the collapse of Ibanera Singapore.

4. Deltec filed this suit in March 2025. When Carbonara was required to finally explain why he had instructed Ibanera to keep Deltec's funds, he testified that some unidentified Deltec transfers had caused Ibanera Singapore to lose its Singapore bank account and lose its Singapore license in 2024.

5. Carbonara's testimony was false. Ibanera Singapore voluntarily surrendered its bank account with DBS due to the bank's consistent and critical issues with their wire transfer data support. And Ibanera Singapore's license with the Monetary Authority of Singapore lapsed because Ibanera Singapore failed to begin operations for six months after receiving that license.

6. Carbonara also testified that he had unilaterally converted all of Deltec's funds into virtual assets without informing Deltec and that Ibanera held those virtual assets in a secure wallet on a platform where the assets remained in Ibanera's custody. This testimony, too, was false. Ibanera had converted only a portion of Deltec's funds to digital tokens and those assets

were not in a secure wallet in Ibanera's custody. Carbonara had directed Ibanera to transfer the digital tokens to the custody of an exchange in order to gain returns for Ibanera and Carbonara.

7. Incredibly, even after Ibanera had converted Deltec's funds to digital tokens and transferred the tokens to an exchange, Ibanera continued to represent to Deltec via its online account that Deltec's funds were preserved in various fiat currencies.

8. Incredibly, Mr. Carbonara, who is now *running for U.S. Congress* in Florida's 25th District, has sought advice about how to use his new political connections to help him engage in a smear campaign against Deltec. That smear campaign has included publishing false and defamatory statements about Deltec.

9. Ibanera has breached the parties' contract by keeping Deltec's funds. It has also breached its fiduciary duties to Deltec by refusing to return Deltec's property after Deltec reposed its property to Ibanera in trust and Ibanera accepted that trust.

10. Further, Ibanera and Carbonara have committed affirmative acts of dominion and control over Deltec's property that are inconsistent with Deltec's ownership, including refusing to provide information about the status of Deltec's funds, converting fiat currency held in trust into cryptocurrency, transferring that cryptocurrency to third party exchanges, concealing those actions while continuing to display false fiat balances, and making false representations regarding the status and whereabouts of Deltec's property. Defendants acted with felonious intent to deprive Deltec of its right to possession, use, and beneficial control of its funds.

11. Finally, as part of a coordinated smear campaign, Defendants have defamed Deltec in retaliation for filing this suit.

## THE PARTIES

12. Plaintiff Deltec is a bank incorporated in The Commonwealth of The Bahamas, and has its principal place of business at Deltec House, Lyford Cay, Nassau, The Bahamas.

13. Defendant IBANERA LLC is registered with FinCEN as a Money Service Business incorporated under the laws of the State of Wyoming, and lists its principal place of business at 2120 Carey Ave, Cheyenne, WY 82001. However, the Ibanera website states "Come say hello at our office HQ" at 2425 E. Commercial Blvd, Suite 403, Fort Lauderdale, Florida. That suite is vacant. Ibanera claims to provide global connectivity for banking institutions.

14. Defendant IBANERA LLC is owned/operated/controlled by two individuals: David Parr ("Parr") and Michael Carbonara ("Carbonara").

15. Upon information and belief, Parr is a resident and citizen of Texas.

16. Upon information and belief, Defendant Michael Carbonara is a resident and citizen of Florida. Carbonara's only identifiable address is a private mailbox at 102 NE 2nd St. #112, Boca Raton, Florida.

## JURISDICTION AND VENUE

17. Complete diversity of citizenship exists between Plaintiff and all Defendants in this case. The amount in dispute in this action, exclusive of interest and costs, exceeds the sum of $75,000. Therefore, this Court has jurisdiction over this dispute under 28 U.S.C. § 1332.

18. This Court has personal jurisdiction over Defendants because Carbonara lives in Florida and Ibanera LLC advertises its headquarters are located in Florida.

19. Venue in this district is proper, including pursuant to Section 28.2 of the PSA.

# FACTS

**A. Carbonara's payment processing history and the formation of Ibanera.**

20. Michael Carbonara, his brother Joseph Carbonara and Glenn Murphy are all high-level employees of Defendant Ibanera. These three started in the payment processing business around 2011 with a company called First Global Billing, which specialized in high-risk merchant accounts including online gambling, adult entertainment, gaming, and other sectors often shunned by traditional banks.

21. Defendant Ibanera purports to be a "FinTech enablement platform that provides businesses and institutions with global connectivity for banking and payments."

22. However, Ibanera is not licensed by any state to transfer funds on behalf of clients. Instead, Ibanera opens "FBO" (for the benefit of) bank accounts in its own name and deposits its clients' funds in those accounts. Ibanera then instructs its banks to wire funds from the FBO accounts on behalf of Ibanera's clients.

23. The funds in its FBO accounts never become Ibanera's assets and are not available to Ibanera for any purpose other than transmitting the funds at its clients' instruction. When a customer deposits funds with Ibanera for transmission, it is similar to providing a valet with car keys. The valet can move the car when asked, but the car never belongs to the valet.

24. Ibanera advertises that it "operates under Ibanera Private Limited, a company registered in Singapore" and represents that Ibanera Singapore is a Major Payments Institution licensed by the Monetary Authority of Singapore ("MAS"), authorized to provide cross-border money transfer services.

25. Ibanera represented that it was able to provide the following services:




**B. The Parties' Agreement.**

26. Plaintiff Deltec is a bank incorporated in The Commonwealth of The Bahamas. To facilitate cross-border money transmittal, Deltec partners with money service businesses and other financial institutions.

27. In late 2023, Deltec was introduced to Carbonara as a potential partner who could perform cross-border transfers and provide multicurrency payment accounts for Deltec and its clients. Deltec told Carbonara that it was looking for a partner to assist with transmitting both Deltec's own funds and funds belonging to Deltec's clients.

28. In a December 26, 2023 email, Deltec wrote to Carbonara "as you know MT 103, 202 are important for us."

29. An MT103 transfer is a SWIFT message used to execute a single payment on behalf of a client of a bank. This type of transfer instructs the sending bank to pay a specific amount on behalf of a client to a named beneficiary. The MT103 message includes mandatory details regarding the ordering customer, beneficiary customer, and purpose.

30. An MT202 General Financial Institution Transfer is used by a bank when it transmits its own funds via the SWIFT payment system. The MT202 designation informs SWIFT and the receiving financial institution that the transfer is an interbank funds movement, not a customer wire.

31. Ibanera represented that it could provide these services for Deltec. In reliance on Ibanera's representations, on July 18, 2024, Deltec entered into a Payment Services Agreement ("PSA") with Ibanera and Ibanera Singapore. (PSA attached hereto as **Exhibit A**.)

32. The PSA imposed no particular obligations only upon Ibanera Singapore, nor did it grant any rights to only Ibanera Singapore. Rather, Ibanera Singapore and Ibanera are defined and treated as one entity throughout the PSA. (PSA at p. 1: "**Ibanera Pte Ltd [Ibanera Singapore] along with Ibanera collectively referred to herein as 'Ibanera'**.") (Emphasis in Orig.)

33. Under the PSA, Ibanera promised to "provide transactional payment services," including: (a) providing multicurrency payment accounts in the name of Deltec and its clients; (b) providing transactional payment services which allow Deltec and its clients to send, receive, and transfer funds via the SWIFT payment scheme and other payment schemes; and (c) providing real-time currency conversion services on Deltec's request. (PSA, Schedule B, § 3.)

34. Under the PSA, Ibanera was required to provide "Segregated Client Accounts" with financial institutions of its own choosing, in which Ibanera promised to hold "all Funds sent by [Deltec] . . . **in trust at all times by Ibanera for and on behalf of [Deltec], for the sole benefit of [Deltec]**." Those funds "may be used **exclusively and specifically** for and on behalf of [Deltec]" and "**Ibanera may not make any use**, encumbrance, lien, promise and/or any other disposition with respect to the Funds, **other than in strict accordance with [Deltec's] Payment**

**Instructions**." The funds in these accounts "remain the property of [Deltec] and will not constitute part of Ibanera's assets." (PSA, §§ 1.1, 2.8 (emphases supplied).)

35. The PSA defined the "Relevant Funds" in the Segregated Client Account as "funds received from client and/or sent by [Deltec] from time to time to the Segregated client Account(s) and held in the Segregated client Account(s) during the term of the Agreement." *Id*.

36. The PSA states, "[u]pon receipt of a Payment Instruction, Ibanera shall be responsible to execute the respective Payment as soon as possible and in any event by no later than three (3) Business Days in strict accordance and compliance with the Payment Instructions provided by [Deltec]." (PSA, § 2.6.)

37. Ibanera Singapore established an account with the Development Bank of Singapore ("DBS") for this purpose, which it used to hold funds for Deltec and its clients. Ibanera established one or more accounts at Cross River Bank in the U.S. for the same purpose.

**C. Deltec deposited its own funds to the Ibanera account and directed Ibanera to transfer those funds.**

38. Prior to the collapse of Ibanera Singapore in November 2024, Ibanera executed cross-border money transfers via the SWIFT network using Ibanera Singapore's DBS account and license from the Monetary Authority of Singapore.

39. From the inception of the parties' relationship, Deltec transferred its own funds into the Segregated Client Account in Singapore, as was evident from the MT202 SWIFT message type that Deltec used to send the funds.

40. On July 22, 2024, four days after the PSA was signed, the Head of Operations at Deltec sent an email to Michael Carbonara himself, stating: "Please find attached the funding we will be sending into our accounts at Ibanera between today and tomorrow." Attached to the email

were four MT202 SWIFT transfers showing Deltec transferring its own funds into the Segregated Client Account.

41. Carbonara did not object to Deltec sending its own funds to the Segregated Client Account and Ibanera did not reject these transfers. Nor would there be any reason to reject the transfers, as the PSA specifically contemplated that Deltec would send its own funds into the Segregated Client Account.

42. On July 23, 2024, Ibanera[1] sent Deltec a request for information ("RFI") from Ibanera regarding the MT202 transfers used to fund Deltec's account with Ibanera, asking two questions: (1) "What is your anticipated monthly and yearly transactional activity ($). As well as the frequency (number of transactions)"; and (2) "Please confirm the origin of the funds for these transactions."

43. Deltec responded the same day, writing: "Related to anticipated monthly and yearly activity: Please find attached the analysis of our past payments across our counterparties. We intend to use Ibanera for a percentage of it." Deltec attached documentation showing the movement of more than $5.4 billion in funds across all of its accounts in the prior calendar year.

44. Deltec also responded: "Related to the origin of the funds. The origin of the funds is general financial institutions transfers. Please see the attached supporting document." Deltec attached documentation showing that its own funds were being transferred.

---

[1] Ibanera typically communicated to Deltec through Ibanera's contractor, io.finnet ("IO"), as an intermediary. For the purposes of these allegations, communications from IO are treated as communications from Ibanera.

45. Deltec continued to send MT202 bank-to-bank transfers of its own funds to the Segregated Client Account. It used those funds in the same way it would use Deltec-owned funds held in other accounts, including to satisfy client requests for fund transfers.

46. The Ibanera bank account with DBS was set up to receive MT202 bank-to-bank transfers. But DBS did not permit MT202 transfers out of that account. So, all transfers ***out of*** the Segregated Client Account had to be designated as MT103 customer transfers, even when those were transfers of Deltec-owned funds.

47. In September 2024, Deltec asked "if Ibanera is able to execute outgoing transfers on behalf of Deltec via MT202." Ibanera checked with DBS then responded that it was not possible for Ibanera's clients to send MT202 transfers from the DBS account. So, Deltec continued to use the MT103 SWIFT code for customer transfers even when transferring its own funds out of the Segregated Client Account.

48. At no point during the parties' relationship did Carbonara, Ibanera, Ibanera Singapore, IO, DBS, or anyone else object to Deltec transferring its own funds into or out of the Segregated Client Account.

**D. Ibanera Singapore collapses.**

49. In 2024, Ibanera Singapore submitted an application to the Monetary Authority of Singapore to expand the scope of its licensed activity in Singapore.

50. In June 2024, the Monetary Authority of Singapore ("MAS") wrote to Ibanera Singapore stating that it had consistently been in a negative equity position and had failed to meet the MAS base capital requirements. MAS informed Ibanera Singapore that it would not consider its application until this regulatory violation was remedied.

51. Ibanera Singapore and Ibanera met with MAS in October 2024 to discuss the application.

52. Meanwhile, Ibanera Singapore was having difficulty timely executing on SWIFT transfers through DBS as requested by its customers. In mid-October 2024, Ibanera informed Deltec that Ibanera Singapore was unable to perform SWIFT transfers.

53. On October 24, 2024, Ibanera Singapore's Chief Operating Officer wrote to DBS stating "I am writing on behalf of Ibanera Pte Ltd. to formally notify you of our decision to close all accounts held with DBS Bank." Ibanera Singapore asked DBS to transfer all funds to an account at Green Link Digital Bank.

54. Ibanera Singapore later explained to its regulator, MAS, why it made the decision to change banks:

> On 8th November 2024, we made the difficult decision to close our multi-currency DBS account due to consistent and critical issues with their wire transfer data support, which significantly disrupted [Ibanera Singapore's] operations. Despite repeated attempts to address these concerns, the lack of adequate response and timely support from the relationship team only exacerbated the situation. As a result, we transitioned our banking operations to Greenlink Digital Bank (GLDB), hoping for a more reliable and responsive service.

55. On November 11, 2024, Deltec wrote to Ibanera about its funds that were frozen with Ibanera Singapore because Ibanera Singapore could not execute SWIFT transfers. Deltec expressed concern that Ibanera had not provided updates regarding the progress toward resolving the issue.

56. Ibanera responded with apologies that it still had no SWIFT access but explained that it was "actively reallocating liquidity, and funds are expected to be accessible through their

alternative sponsor bank, Green Link, within the coming week" and that "Ibanera is prioritizing the transition to restore seamless operations as quickly as possible."

57. In mid-November 2024, Ibanera informed Deltec "you now have access to your account at Ibanera with Green Link Bank" and that it "is fully set up for the new SWIFT rails at Ibanera Singapore and is ready for operations on your dashboard."

58. But on November 27, 2024, MAS wrote to Ibanera Singapore to inform it that its license had lapsed and was not valid. Under Singapore's Payment Services Act, if a licensee does not commence business within six months after the grant of the license, then the license lapses and is no longer valid. MAS wrote: "[a]s the Licensee has not commenced business in the cross-border money transfer service since 28 Jan 2020, the Licensee's license lapsed on 28 July 2020, upon the expiry of a continuous period of 6 months after 28 January 2020."

59. Under Section 22(7) of Singapore's Payment Services Act, a major payment institution must, within 45 days after its license is surrendered, lapsed or revoked, submit to MAS a closure certificate issued by its auditors confirming that all moneys held by the company have been received by the intended recipients of those moneys.

60. Accordingly, MAS instructed Ibanera Singapore to "settle all outstanding liabilities for unpaid annual fees and MASNET fees if any and provide a closure certificate." It sent another email the next day, reminding Ibanera Singapore, "[a]s the licence has lapsed, please provide us with the closure certificate once all customer obligations have been settled."

61. When Ibanera Singapore's license lapsed, Green Link Bank closed Ibanera Singapore's account because it could no longer conduct its business in Singapore. Once again, Ibanera Singapore was unable to transfer funds for its clients.

**E. Ibanera Singapore transfers all funds and liabilities to Ibanera LLC and stops operating.**

62. When Green Link Bank closed Ibanera Singapore's account, Ibanera Singapore transferred all customer money to the United States account of Ibanera. From that date forward, Ibanera Singapore no longer held any of Deltec's funds or serviced Deltec. As Ibanera Singapore explained to MAS, after the Green Link account was closed, "the customers were continuing to be serviced by Ibanera LLC."

63. On December 5, 2024, Ibanera informed Deltec that, "[d]ue to account relocation at GreenLink between Ibanera entities, deposits and withdrawals are not processable at the moment" and "we sincerely apologize for this additional inconvenience on top of the current challenges you are facing."

64. MAS asked Ibanera Singapore to provide a closure certificate, required under Singapore law, confirming that it had returned to its customers all customer funds that it was holding when it lost its license.

65. Ibanera Singapore informed MAS: "[u]pon transfer of all customer money and deposit of the DBS bank draft to Ibanera LLC's US Account. The Company considered no further liabilities are to be assumed. In addition, Ibanera LLC has agreed to undertake any liabilities in respect of the payment service provided to the customers upon cessation of business of the Company on December 31st, 2024."

**F. Ibanera took exclusive control over the Trust Funds and assumed all liability to Deltec.**

66. After the Green Link closure, Ibanera Singapore transferred all of Deltec's funds to Ibanera, which thereafter exercised exclusive custody, dominion, and control over the Trust Funds ("Trust Funds" refers to all unreturned funds deposited with Ibanera by Deltec and its

clients) and all related accounts, portals and wallets. Ibanera is the only party capable of returning the Trust Funds.

67. When Ibanera Singapore transferred its funds to Ibanera, Ibanera agreed to assume all of Ibanera Singapore's liabilities to its customers, including Deltec, and Deltec's requests thereafter were directed to Ibanera for performance, return of the Trust Funds, and accounting for the Trust Funds. Deltec seeks no relief in this action from Ibanera Singapore.

68. All of Deltec's funds that Ibanera Singapore transferred to Ibanera were "Relevant Funds" under the PSA that Deltec sent to a Segregated Client Account. These are special deposits against which no setoff is permitted.

**G. Deltec instructs Ibanera to transfer its funds and Ibanera fails to do so.**

69. On January 6, 2025, Deltec instructed Ibanera to transfer the following Trust Funds back to Deltec accounts: AUD 276,481.63; EUR 1,974,152.25; HKD 43,978.80; GBP 1,064,830.86; JPY 497,365,849; SGD 262,718.33; CAD 404,701.79; and CHF 1,264,985.62.

70. Deltec wrote: "It is expected that once Ibanera has the swift platform operational again, we will transfer funds back to our account with Ibanera, however presently we require liquidity."

71. On January 6, 2025, Ibanera confirmed the transaction request and responded: "Please note that we have received confirmation today that SWIFT rails and Multi-Currency Accounts are expected to be operational again by the end of this month. You may wish to reconsider your instructions based on this timeline." Deltec reiterated its instruction to Ibanera to release the Trust Funds, but Ibanera did not do so.

72. On January 8, 2025, January 13, 2025, and January 15, 2025, Deltec repeated its urgent requests for return of its Trust Funds. Ibanera apologized for the extended processing time.

73. On January 31, 2025, Deltec again instructed Ibanera to return the Trust Funds and further instructed Ibanera to return an additional USD $7,000,000 of the Trust Funds.

74. Ibanera now claims that, in the last week of January 2025, Michael Carbonara decided that Ibanera would not comply with Deltec's request for the return of its funds. Carbonara decided that, instead, Ibanera was going to indefinitely withhold or otherwise retain Deltec's Trust Funds. Ibanera did not inform Deltec of this decision.

75. After receiving no response from Ibanera, on February 3, 2025, Deltec's in-house legal counsel, Lanecia Darville, sent a letter to Carbonara, as CEO of Ibanera, demanding the return of all of the Trust Funds within fourteen days.

**H. Ibanera begins to dissemble and offer pretexts for failing to return Deltec's funds.**

76. On February 11, 2025, Ibanera claimed **for the first time** that Deltec had somehow "failed to fully comply with all obligations" under the PSA and that Ibanera had "suffered significant losses" of some unspecified nature and amount that it was "currently evaluating." No facts were provided regarding either Deltec's purported conduct or Ibanera's purported losses.

77. Ibanera's February 11th letter was the first time Ibanera had suggested that Deltec was to blame for Ibanera's failure to transfer the funds it held in trust for Deltec. At no time in the parties' monthly meetings, in their tracking reports of open issues, over the course of the many email exchanges, or at any other time, did Ibanera state that Deltec was in breach of the PSA or that the funds were rightfully and deliberately being withheld. To the contrary, Ibanera claimed to be processing the payment direction and promising that it would be operational again soon.

78. On February 21, 2025, Deltec again demanded the immediate release and transfer of all Deltec funds in Ibanera's possession by February 25, 2025, and demanded an immediate

accounting of fraud or loss "[i]f Ibanera has misappropriated and/or otherwise lost or misused those funds."

79. On February 26, 2025, Ibanera replied, promising that Deltec's funds "are in safeguarded accounts and no one is misusing or misapplying such funds" and that "the funds are segregated and protected."

80. However, Ibanera's justification for withholding the funds shifted. It now claimed that "Ibanera is under audit at The Development Bank of Singapore Limited ("DBS") and the Monetary Authority of Singapore. Ibanera is also undertaking an internal audit and investigation. Until the investigations are complete, Ibanera needs to preserve the funds in a segregated account."

81. On April 7, 2025, counsel for Ibanera and Carbonara represented that Ibanera is entitled "**to keep DBT funds**" to offset its "losses"; that Ibanera is entitled to "**retain deposits** made under [the PSA]"; that Deltec's funds in Segregated Client Accounts were actually just "a security deposit" that Ibanera LLC and Carbonara "**are entitled to retain as compensation** for the damages suffered" (or "retain . . . **as partial compensation for damages incurred**").

82. Ibanera LLC and Carbonara's attorney stated that his clients are keeping Deltec's funds to compensate themselves for such damages as the "Complete suspension of Ibanera Singapore's operations," which Ibanera falsely represented was a "regulatory action" by MAS "triggered by [Deltec's] unauthorized activities, **which MAS determined violated Singapore's financial regulations**."

**I. Deltec files suit and Carbonara retaliates with a defamatory "smear campaign."**

83. Deltec filed this action on March 3, 2025.

84. Upon information and belief, after Deltec filed suit, Carbonara falsely told Kerim Eravci, a client of Ibanera, that Deltec committed sanctioned transfers.

85. On March 4, 2025, Kerim Eravci wrote an email to Richard Gardner, the CEO of a company called Modulus. On information and belief, Carbonara, who was included as a recipient of the email, authorized, approved and directed Eravci to send the email on Carbonara's behalf. It states, in part:

> The CEO of the bank I've been partnered with Ibanera is going to be running for congress with the help of DeSantis's team, Tom Cotton, Governor Abbot and many other key republican players.
>
> This last year, they took on a client called Deltec which committed sanctioned transfers and now, they've been patiently waiting for them to file a lawsuit to countersue them at the instruction of their lawyers. Ibanera has frozen $18M of their funds.
>
> This will turn into a long nasty battle and I remember you were king of fighting fire with fire. They are looking for a serious PR guy who can run smear campaigns against Deltec to play the dirty game Deltec is starting and help refortify Michaels online reputation since it matters now.

86. That email was false and defamatory per se. Deltec has not committed "sanctioned transfers," nor has Ibanera suggested as much in this action or identified any transaction that is subject to economic or trade sanctions laws.

87. Mr. Gardner responded with the following suggestions, among others: (a) "File suit on Jean Chalopin personally in Miami with fraud claims. I also think RICO is relevant"; (b) "contact . . . the DOJ through Trump's team and work out a whistleblower deal"; (c) "leverage your political connections to ensure Jean gets arrested at the right time."

88. Mr. Gardner also suggested that Carbonara "hire private investigators in each location where Jean has done business. Have them dig deep and go undercover in person, conduct interviews with associates, and more. You will need this ammo to keep the authorities interested.

I would provide all of that info to the authorities, and simultaneously post everything online, under an untraceable account—and of course include everything in the lawsuit."

89. On March 12, 2025, Carbonara took one step forward in his smear campaign. Ibanera published a false statement on its website that improperly and inaccurately ties Deltec to "the FTX fraud," "money laundering, and all types of fraud" and also refers to unidentified "regulatory authorities" purportedly conducting an investigation of Deltec's transactions with Ibanera. In the same written publication, Ibanera attempts to mask the defamatory public statement with a disclaimer, only the disclaimer itself is defamatory by suggestion: "Ibanera takes no position on whether any impropriety by Deltec has actually occurred."

90. Deltec has never been contacted by any regulatory authority regarding its transactions with Ibanera. Ibanera has produced no evidence that any regulatory authority is investigating those transactions. Ibanera's public statements about Deltec are false and defamatory.

**J. Ibanera converts the majority of Deltec's funds to digital tokens while continuing to represent that the Trust Funds were held in fiat currency.**

91. Ibanera should hold Deltec's Trust Funds in the following readily-identifiable currencies and amounts (valued at roughly USD $ 20,674,066, depending upon exchange rates):

- USD $10,996,765
- UD A$ 276,482
- CAD C$ 404,702
- CHF 1,439,074
- EUR € 2,474,124
- GBP £ 1,075,466
- HKD HK$ 43,979
- JPY ¥ 497,365,850

- SGD S$ 262,718

92. Ibanera accepted these funds in trust and communicated the balances in Deltec's accounts to Deltec via an online ledger accessible by Deltec.

93. On or about May 2, 2025, Ibanera wrote to Deltec, purporting to terminate the PSA for cause due to some unspecified breach by Deltec. Ibanera wrote "[t]his letter is not the place to elaborate upon the multiple reasons for our decision to terminate the Contract."

94. On or about May 5, 2025, at Carbonara's direction and without Deltec's knowledge or consent, Ibanera used $18 million in Trust Funds to purchase USD Coin ("USDC"), a privately issued blockchain-based cryptographic token that is not legal tender and is dependent upon the issuer's ability and willingness to redeem it.

95. Ibanera did not notify Deltec that it had converted the Trust Funds to digital tokens. To the contrary, after the conversion to digital tokens, Ibanera continued to falsely represent on its online account portal that Deltec's funds were held in various government-issued fiat currency.

96. On May 6, 2025, at Carbonara's instruction, Ibanera transferred the portion of the Trust Funds that had been converted to USDC into an Ibanera account on the FalconX exchange, a digital asset brokerage and trading platform. Ibanera did this in order to gain returns for itself from its wrongful taking of Deltec's funds. FalconX had recently announced a structured credit facility in digital tokens that would enable holders of USDC to gain significant returns from transferring USDC to FalconX.

97. On May 14, 2025, a Deltec employee printed a screen shot of Ibanera's online ledger visible to Deltec. Ibanera's online ledger stated that, on that day, Deltec's funds were held in the Segregated Client Account, in fiat currencies, as follows:




98. As of May 14, 2025, Ibanera's representations on its online ledger were false. Ibanera had transferred all funds out of that account by May 6, 2025 and used the funds to purchase digital tokens.

99. In August 2025, the cryptocurrency exchange Binance announced "a promotion for USDC Simple Earn Flexible Products," allowing users who invest USDC in the products to "enjoy up to a 12% APR."

100. In order to further enrich themselves from their theft of Deltec's specially deposited Trust Funds, on August 23, 2025, Defendants transferred Deltec's funds that had been converted into over 18 million USDC into the Binance exchange.

### K. Carbonara gives false testimony, including that Deltec caused DBS to terminate Ibanera Singapore's bank account and that Deltec caused MAS to revoke Ibanera Singapore's license.

101. Despite the fact that Ibanera Singapore decided to close its DBS account due to issues with DBS's wire transfer data support, and the fact that MAS found that Ibanera Singapore's license had lapsed because of its failure to commence business within six months of receiving that license, Michael Carbonara has falsely testified that Deltec is to blame for both of these occurrences.

102. On May 13, 2025, Michael Carbonara submitted a sworn declaration to this Court, which states: "In late 2024, unilaterally and without notice, DBS closed the account of Ibanera Private Ltd. ('Ibanera Singapore') and the Monetary Authority of Singapore ("MAS") revoked Ibanera Singapore's license."

103. Carbonara then gave sworn testimony that DBS never communicated any reason for its purported unilateral closure of the bank account:

Q. So DBS hasn't communicated any reason for why it closed
the account?
A. It's not typical for any bank to give those reasons.
Q. And DBS didn't?
A. Correct.

104. Carbonara also gave sworn testimony that MAS never communicated any reason for its revocation of Ibanera Singapore's license.

Q. Has Ibanera received any communication whatsoever from MAS about the reason why it revoked the license?
A. The MAS investigation is ongoing.
Q. So my question is: Has it communicated any reason whatsoever?
A. No. It's an ongoing investigation.

105. Carbonara testified that "Ibanera launched a series of investigations, including an independent external audit conducted by the former Head of a Policy Division at the MAS, to determine the cause of the DBS account closure and MAS license revocation." The purported "independent external audit" was actually submitted by Nizam Ismail, Ibanera Singapore's own former Head of Legal and Compliance, and the substantive conclusions in the report were Carbonara's own conclusions, sent to Mr. Ismail.

106. According to Carbonara, "The investigations determined that Deltec used Ibanera's services in violation of the PSA, leading to the DBS account closure and MAS license revocation."

107. Carbonara also testified, on May 16, 2025, that all of Deltec's funds had been converted to USDC "[t]o safely safeguard the funds," although the funds were not at risk before the conversion.

108. Carbonara's testimony that "all of Deltec's funds" were converted was false. Ibanera converted $18 million worth of Deltec's funds to USDC and held the remaining roughly $3 million in fiat in an Ibanera bank account.

109. Carbonara testified that, as of May 16, 2025, the USDC was held securely in a "Ledger" wallet owned by Ibanera. Ledger provides a platform to store private keys to wallets,

allowing wallet owners to control assets associated with the wallets. Unlike assets in an exchange, digital assets in a Ledger wallet remain in the custody of the wallet owner.

110. That testimony, too, was false. In fact, ten days earlier, Carbonara had directed Ibanera to transfer the USDC to an exchange in order to invest the USDC and gain a return for Ibanera and Carbonara.

111. Carbonara also testified that Ibanera would retain Deltec's funds until an audit for MAS was completed. Upon information and belief, all such audits are complete.

112. As CEO of Ibanera, Carbonara knew that Ibanera had a fiduciary duty to Deltec to hold its funds in trust. Nevertheless, Carbonara directed Ibanera not to release the funds, knowing these actions would deprive Deltec of the use of its funds.

113. On information and belief, Ibanera knowingly obtained Deltec's funds with the intention of temporarily or permanently appropriating the funds for its own use or the use of Carbonara. Carbonara's phony excuses and false testimony are all part of Defendants' continuing scheme to keep Deltec from obtaining the return of its funds.

114. Ibanera's failure to release Deltec's funds has led to substantial injury, including the theft of at least $20,674,066 worth of fiat in various currencies, interest on the unlawfully taken funds, and additional injuries that Deltec has suffered and will continue to suffer as a result of Ibanera's improper and unlawful conduct due to interruption of services, interference with business relationships, third party claims, and other injuries suffered as a result of Ibanera's actions, including attorney's fees and costs pursuant to Section 26.2 of the PSA.

## COUNT I

**Breach of Contract (against Ibanera)**

115. Deltec realleges and incorporates by reference its allegations in Paragraphs 1 through 114 as though fully incorporated herein.

116. On July 18, 2024, Deltec and Ibanera entered into the PSA, pursuant to which Ibanera would hold Deltec's funds in trust for Deltec, and Deltec would pay Ibanera a fee to process transactions on Deltec's behalf.

117. Deltec has duly performed all of its obligations and duties under the PSA.

118. Ibanera has materially breached the contract by failing and refusing to return Deltec's funds after it took custody of the funds in violation of Sections 2.6 and 2.9 the PSA.

119. Ibanera's breaches occurred after Ibanera Singapore collapsed and after Ibanera assumed custody and control over all funds and obligations.

120. Ibanera's failure and refusal to release Deltec's funds has led to damages of at least $20,674,066 worth of fiat in various currencies, interest on the unlawfully withheld funds, and additional damages Deltec has suffered and will continue to suffer as a result of Ibanera's breach due to interruption of services, interference with business relationships, third party claims, and other damages suffered as a result of Ibanera's actions, including attorney's fees and costs pursuant to Section 26.2 of the PSA.

121. Deltec requests an order awarding damages that would place it in the position it would have occupied absent Ibanera's breach of the PSA, attorneys fees and costs, prejudgment interest, and such other relief as the Court may find just and appropriate.

**COUNT II**

**Breach of Fiduciary Duty (against Ibanera)**

122. Deltec realleges and incorporates by reference its allegations in Paragraphs 1 through 121 as though fully incorporated herein.

123. Ibanera owed Plaintiff fiduciary duties arising from Plaintiff's reposal of trust in Ibanera and Ibanera's acceptance of that trust. Plaintiff deposited its own readily identifiable funds with Ibanera for a specific purpose, those funds remained Plaintiff's funds, and Ibanera accepted exclusive custody and control over Deltec's funds for a specific and limited purpose.

124. Upon accepting custody of Deltec's funds, Ibanera assumed trustee-like obligations under Florida common law, including duties of loyalty, care, full disclosure, and to refrain from using entrusted property for Ibanera's own benefit.

125. These duties existed independent of any contract and arose by operation of law from the relationship of trust and confidence created when Ibanera accepted exclusive control over Deltec's specifically identifiable funds for a limited custodial purpose.

126. Ibanera breached its fiduciary duties to Deltec by, among other things, misappropriating the entrusted funds, converting the entrusted funds into digital assets, transferring the digital assets to third-party exchanges, deploying the digital assets for Ibanera's own benefit, concealing the true location and nature of Deltec's property and falsely representing to Deltec that its funds remained securely held in fiat currency after they had been converted and transferred.

127. Ibanera's misconduct was willful, intentional and/or so reckless and wanting in care that it constituted a conscious disregard or indifference to Deltec's rights, as evidenced by the following objective facts: (a) Defendants affirmatively converted Trust Funds from fiat into digital assets, a step unnecessary for safeguarding and consistent with enabling transfer,

deployment, and concealment; (b) Defendants transferred the converted assets to third-party exchanges and platforms, enabling use of the Trust Funds for Defendants' own benefit; (c) Defendants concealed the conversion and movement of the Trust Funds and maintained false account and portal representations reflecting fiat balances that no longer existed; (d) after Deltec made demands for return of the Trust Funds, Defendants refused to return them and continued to assert control despite knowing the funds did not belong to Defendants; (e) in sworn testimony given during this action, Carbonara materially misrepresented facts concerning the conversion, location, and use of the Trust Funds as set forth herein.

128. Deltec seeks monetary damages as well as equitable relief including imposition of a constructive trust over the Trust Funds or proceeds therefrom, disgorging all profits or other benefits Ibanera or others have gained from Ibanera's self-dealing with the Trust Funds, forfeiture of all compensation Ibanera has taken while breaching its duties, and punitive damages for Ibanera's intentional misconduct and/or gross negligence.

## COUNT III

### Conversion (against Ibanera)

129. Deltec realleges and incorporates by reference its allegations in Paragraphs 1 through 114 as though fully incorporated herein.

130. Ibanera exercised unauthorized dominion and control over specific, identifiable funds belonging to Deltec, including funds held in segregated client trust accounts maintained for Plaintiff's sole benefit, and used the funds in an unauthorized fashion for its own benefit.

131. Deltec retained ownership of the funds at all times and had an immediate right to possession upon demand. Deltec demanded the funds beginning in January 2025. Defendants were custodians only and had no authority to use the funds for their own purposes.

132. Ibanera committed conversion by affirmatively misappropriating the funds, including converting fiat currency into digital tokens, transferring the assets to third-party exchanges, deploying the funds for its own benefit, and concealing the true status and location of the funds.

133. Ibanera has committed affirmative acts of dominion inconsistent with Deltec's ownership, including refusing to provide information about the status of Deltec's funds, converting fiat currency held in trust into cryptocurrency, transferring that cryptocurrency to third party exchanges, concealing those actions while continuing to display false fiat balances, and making false representations regarding the status of Deltec's property.

134. Ibanera's misconduct was willful, intentional and/or so reckless and wanting in care that it constituted a conscious disregard or indifference to Deltec's rights, as evidenced by the following objective facts: (a) Defendants affirmatively converted Trust Funds from fiat into digital assets, a step unnecessary for safeguarding and consistent with enabling transfer, deployment, and concealment; (b) Defendants transferred the converted assets to third-party exchanges and platforms, enabling use of the Trust Funds for Defendants' own benefit; (c) Defendants concealed the conversion and movement of the Trust Funds and maintained false account and portal representations reflecting fiat balances that no longer existed; (d) after Deltec made demands for return of the Trust Funds, Defendants refused to return them and continued to assert control despite knowing the funds did not belong to Defendants; (e) in sworn testimony given during this action, Carbonara materially misrepresented facts concerning the conversion, location, and use of the Trust Funds as set forth herein.

135. Deltec seeks equitable relief including imposition of a constructive trust over the Trust Funds or proceeds therefrom, disgorging all profits or other benefits Ibanera has gained

from its self-dealing with the Trust Funds, forfeiture of all compensation Ibanera has taken, and punitive damages for Ibanera's intentional misconduct and/or gross negligence.

**COUNT IV**

**Civil Theft (against Ibanera and Carbonara)**

136. Deltec realleges and incorporates by reference its allegations in Paragraphs 1 through 114 as though fully incorporated herein.

137. Defendants knowingly obtained and used specific, identifiable funds belonging to Plaintiff and its clients, including funds held in segregated client trust accounts maintained for the sole benefit of Plaintiff and its clients.

138. At all relevant times, Deltec retained ownership of the Trust Funds. Defendants were custodians only and had no ownership interest in, or right to appropriate or deploy, the Trust Funds for Defendants' own benefit.

139. Defendants knowingly and intentionally used and appropriated the Trust Funds without authorization, including by: converting fiat currency into digital tokens; transferring those tokens to third-party trading and exchange platforms, including FalconX and Binance; deploying the Trust Funds for Defendants' own liquidity, trading, hedging, or operational purposes; and exercising continued dominion and control over the Trust Funds after Deltec demanded their return. Defendants' purpose in converting Deltec's funds to digital assets and investing those assets was to obtain benefits for themselves.

140. Defendants acted with felonious intent to deprive Deltec of its right to possession, use, and beneficial control of the Trust Funds, at least temporarily, as evidenced by the following objective facts: (a) Defendants affirmatively converted Trust Funds from fiat into digital tokens, a step unnecessary for safeguarding and consistent with enabling transfer, deployment, and concealment; (b) Defendants transferred the converted assets to third-party exchanges and

platforms, enabling use of the Trust Funds for Defendants' own benefit; (c) while exercising such control, Defendants concealed the conversion and movement of the Trust Funds and maintained false account and portal representations reflecting fiat balances that no longer existed; (d) after Deltec made clear demands for return of the Trust Funds, Defendants refused to return them and continued to assert control despite knowing the funds did not belong to Defendants; (e) in sworn testimony given during this action, Carbonara materially misrepresented facts concerning the conversion, location, and use of the Trust Funds as set forth herein.

141. Carbonara, as a 50% beneficial owner of Ibanera, receives a personal gain from Ibanera's retention of Deltec's property, conversion to cryptocurrency and transfer to an exchange. He has also shown actual malice toward Deltec by soliciting help with a "smear campaign" and by giving false testimony blaming Deltec for the DBS account closure and the loss of the MAS license.

142. Defendants' conduct would constitute theft under Fla. Stat. § 812.014 regardless of the existence of any contract, as it involved the knowing and unauthorized use of property belonging to another with intent to deprive the owner of the benefit of that property.

143. Defendants' civil theft arises from misappropriation, unauthorized use, and concealment of entrusted property, not from any alleged failure to perform contractual obligations. Defendants' conduct exceeded and violated any limited authority they possessed and would be unlawful even in the absence of a contract.

144. Deltec has complied with the statutory prerequisites of Fla. Stat. § 772.11, including service of a written civil-theft demand letter specifically referencing this statute.

145. As a direct and proximate result of Defendants' civil theft, Deltec has suffered damages and is entitled to: (a) treble damages pursuant to Fla. Stat. § 772.11; (b) or, in the alternative, equitable restitution and disgorgement of all benefits and profits obtained through Defendants' use of the Trust Funds; attorneys' fees and costs as provided by statute; and such further relief as the Court deems just and proper.

**COUNT V**

**Defamation (against Ibanera and Carbonara)**

146. Deltec realleges and incorporates by reference its allegations in Paragraphs 1 through 114 as though fully incorporated herein.

147. After Deltec filed this action, Carbonara sought advice about how to launch a smear campaign against Deltec.

148. Upon information and belief, Carbonara falsely told Kerim Eravci that Deltec committed sanctioned transfers and directed Mr. Eravci to state the same to Richard Gardner.

149. On March 13, 2025, Ibanera, at the direction of Carbonara, published a statement on its website entitled "**Ibanera Issues Public Statement; Refutes Allegations of Wrongdoing by Deltec**." This statement about Deltec repeatedly invokes the specters of "fraud" (including "the FTX fraud"), "money laundering," and "illicit financial activities," including in the following statements:

- "Ibanera refutes allegations that it misappropriated Deltec's funds or committed any wrongdoing. The company is aware of various proceedings in the public record alleging the association of Deltec Bank with those involved in the FTX fraud."
- "Ibanera's handling of Deltec's transactions is necessarily subject to its legally mandated Anti-Money Laundering and Compliance program, which has given rise to protective measures and an ongoing investigation in which Deltec's participation is

fully expected. Ibanera is actively collaborating with regulatory authorities to conclude the investigation and resolve any concerns."

- "A spokesperson from Ibanera stated, 'Today, money laundering, and all types of fraud have become a global problem. Ibanera's transaction monitoring tools help it to comply with anti-money laundering and related regulations, in order to limit fraud and ensure financial integrity in its transactions.'"

150. In this defamatory statement, Ibanera gratuitously and maliciously accuses Deltec of being tied to "those involved in the FTX fraud," despite the fact that the relationship between Ibanera and Deltec did not even begin until years after the FTX collapse. It is true that Deltec (along with dozens of other defendants) was sued in a civil class action related to FTX. But the allegations in that action are false and Deltec has moved to dismiss all claims in that meritless case.

151. The FTX fraud has nothing to do with this case, and Ibanera clearly intended to harm Deltec by falsely creating an association between Deltec and the FTX fraud.

152. By repeatedly associating Deltec with "fraud" (including "the FTX fraud"), "money laundering," and "illicit financial activities," when in fact Deltec has engaged in none of these activities, Ibanera has defamed Deltec (expressly and by implication).

153. Although this defamatory statement disclaims any position about whether Deltec actually committed fraud, money laundering or illicit financial activities, the Defamatory Statement falsely implies that Deltec has engaged in these acts.

154. On March 24, 2025, counsel for Deltec sent written notice to Ibanera LLC's counsel stating that the publication was false and defamatory and demanded that Ibanera withdraw the statements immediately.

155. The defamatory statements damage Deltec in its trade and profession and is therefore defamatory per se and therefore damages are presumed. However, the defamatory statements have also injured Deltec's reputation and caused financial losses. Moreover, the defamatory statements were made with actual malice, ill will and hostility, with the primary purpose and intent to cause harm to Deltec, and Deltec is therefore entitled to punitive damages.

WHEREFORE, Deltec respectfully requests that the Court enter judgment in favor of Deltec and against Defendants, awarding the relief requested herein and all other relief that the Court determines is just and equitable, including prejudgment interest.

**DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury on all issues that are so triable.

Dated: October 7, 2026

Respectfully submitted,

**VENABLE LLP**

*/s/ Jonathan E. Perlman*
Jonathan E. Perlman (Bar No. 773328)
JEPerlman@venable.com
Joseph B. Isenberg (Bar No. 1018077)
jbisenberg@venable.com
801 Brickell Avenue, Suite 1500
Miami, FL 33131
Telephone: 305-349-2396
Facsimile: 305-349-2310

Desirée Moore
dmoore@venable.com
Abram Moore
amoore@venable.com
Daniel Hayes
djhayes@venable.com
227 W Monroe St. #1900
Chicago, IL 60606

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 7, 2026, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification to attorneys of record and is available for viewing and downloading.

*By: /s/ Jonathan E. Perlman*
Jonathan E. Perlman